EQUITY LAND RESOURCES, INC. *v.*
DEPARTMENT OF REVENUE

Edward L. Clark, Jr., Clark & Marsh, Salem, represented plaintiff.

Alfred B. Thomas, Assistant Attorney General, Salem, represented respondent.

Decision for defendant rendered April 23, 1973.

CARLISLE B. ROBERTS, Judge.

Two cases have been consolidated for trial, the parties, property and issue being identical in each. The question before the court is the true cash value of the whole of Block 24, City of Salem, known as the Salem Plaza, as of January 1, 1971, and January 1, 1972. The parties have stipulated that the true cash value of the subject property was the same for each assessment date.

Salem Plaza is located in the high-value section of the central business district of Salem, Oregon. It is a "shopping center" occupied by 18 small tenants whose first-floor space varies from a low of 702 square feet to a high of 10,920. The property consists of the entire block, located between the blocks containing the Meier & Frank department store and the Pay Less Drug Store. The site's south half, fronting on Center Street, is covered by a one-story concrete building built in 1966-67, with a basement under 85 percent of it. Roof-top parking contains space for 188 automobiles. The remainder of the ground level to the north is used for 88 parking spaces. The plaza was placed in operation in the fall of 1966 and has been operating continuously since that date.

The testimony is undisputed that the property was originally planned as one block of a development of four and one-half blocks. The original plans envisaged overhead walkways to Meier & Frank over High Street and to the Pay Less Drug Store over Liberty Street and, possibly, to the block lying south of Block 24. No parking was to be placed on the block in question. However, the developer could not get governmental

permission to establish mid-block street crossings, at grade level or overhead, and further study led the entrepreneurs to the conclusion that the plans were too extensive for the location at the time. The project was curtailed to provide for the present layout, placed in operation at an approximate cost of $3,000,000, this sum being nearly evenly divided between land and building.

Since its inception, there has been a continuing problem as to the true cash value of the property for tax purposes. For 1966-1967 (before the completion of the building), the assessed value of the land was $910,320 and of the improvements, $95,000, for a total of $1,005,320. In 1966, the subject property was reappraised as a part of a general reappraisal of the downtown core area of Salem, and it was placed upon the 1967-1968 assessment roll at $1,169,760 for the land and $1,384,200 for the building (which had been completed), for a total assessed value of $2,553,960. On appeal of the land value, only, to the Oregon Tax Court, it found that it should be reduced to $910,000. The Supreme Court reversed the Tax Court's decision and the values for 1967-1968 and 1968-1969 were established at $2,500,000 for both land and building. (*Commonwealth, Inc. v. Dept. of Rev.*, 259 Or 140, 484 P2d 1103 (1971).) The parties agreed that the assessed value for 1969-1970 should be $2,000,000 and for 1970-1971, $1,850,000.

The interest of the original developer, Commonwealth, Inc., was taken over by GAC Salem Realty Corporation in December 1968. Soon thereafter, the parent corporation, of which GAC Salem Realty Corporation was a subsidiary, determined as a matter of policy to sell off all its operating properties throughout Oregon. Salem Plaza was placed on the market

with an asking price of $1,100,000. Information was supplied to brokers throughout the United States but no serious bids were received, although there is evidence that the property was studied by a number of individual and institutional investors. In May 1970, upon the recommendation of its managing agent, GAC Salem Realty Corporation's interest was offered for $750,000. On December 23, 1970, plaintiff deposited earnest money, agreeing to this amount, the sale to be effective as of January 1, 1971, and the agreement was consummated. (On December 26, 1970, an earnest money receipt was signed by another corporation, offering $800,000, but the first offer had already been accepted.) The total consideration of $750,000 was paid to GAC Salem Realty Corporation for approximately one-third of the land in fee and all the improvements in Block 24, plus the assumption by the plaintiff of eight ground leases, covering the remaining two-thirds of the land, requiring total annual rental payments of approximately $51,000, to be increased 66 percent in regular increments over the term of the leases (60 years beginning in 1966).

The current controversy encompasses the tax years 1971-1972 and 1972-1973, in which the assessed value of $2,200,000 found by the county has been reduced by the defendant herein to $1,700,000. Plaintiff contends that the true cash value for each year in question is $1,250,000.

The plaintiff's value is based upon its conclusion that the agreed consideration of $750,000 *must* represent the market value of its interest and it has capitalized at 10 percent the current rental for the eight leased tracts (constituting two-thirds of the land), "rounded" to $50,000, to establish the value thereof at $500,000, for the total $1,250,000.

Plaintiff's basic contention was that the offer to and purchase by plaintiff as of January 1, 1971, met the requirements of ORS 308.205 and OAR 150-308.205-(A), specifying the criteria for establishing true cash value. The ruling reads:

"a. Market Value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed."

Evidence adduced by the plaintiff indicates that the plaintiff's sole stockholder, who accepted the offer of the property at $750,000, was a professional man with experience in real estate investment. As a witness, he pointed out that the property had been on the market for two years and at the offered price for the last seven of the 24 months, and he believed that there was no compulsion to sell or buy and that the officers of both seller and buyer were "able, willing and reasonably well-informed" as contemplated by the ruling. At the time of the sale, the market was offering high-class bonds with interest at 10 percent. He felt that he was entitled to a 10 percent return on his investment and that his $750,000 could return that sum. By the same rationale, the eight lessors would be entitled to a 10 percent return on their capital investment, then producing income annually of $50,000 (actually $51,000), which, under his formula, would be capitalized at $500,000. He stressed that January 1, 1971, was the middle of a period of high interest rates. He testified:

"* * * This is a time when a person in a high tax bracket, say 50 percent, could realize 10 or 11

percent on municipal bonds net. Certainly those investments are available. One isn't going to buy any shopping center or hotel building or any piece of property that might return only 8 percent, with all the attendant dangers, with the vacancy factors, with repairs, with management problems. It doesn't make sense. And I felt that I certainly was entitled to a 10 percent return and this is the value I put on this property. I felt that with a little luck and properly managed and with the taxes reduced to what they should be, that I could get a 10 percent return."

It must be noted that, on cross-examination, the witness admitted that he had no experience with regard to land values in the Salem area from a sales standpoint and that he had not made any study of the capital rates in use in the Salem area, stating:

"Not on other properties, no, or other sales. I don't care what the fellow down the street's doing. I want to know what I am going to do."

Plaintiff also presented as a witness a man who has been involved with Salem Plaza since 1966 as property manager for successive owners, including the plaintiff. It was his recommendation that the value be reduced to $750,000 to make it possible for him to carry out instructions to sell the property on behalf of GAC Salem Realty Corporation. From January 1966, this witness had been the full-time manager, leasing the property, supervising remodeling and engaging in all of the activities necessary to keep the rental units fully occupied. He described the shortcomings of the plaza as follows:

(a) The mall in the plaza is not properly oriented to carry traffic from the Pay Less Drug Store block or the Meier & Frank block, thus losing some of the advantage sought in the typical shopping center, where

the smaller retailers are located in an area between large department stores, with plentiful parking for all.

(b) The traffic pattern around Block 24, in a one-way street grid, negatively affects the flow of potential customers to the subject property.

(c) Access to the roof parking (188 spaces) is difficult, and there are only 88 spaces on the ground level.

(d) The restaurant layout in one of the larger spaces (6,496 square feet) has proved inappropriate for Salem, but the expense of remodeling it would be large and so improvement has been rejected in favor of a reduced rent.

(e) There is a built-in obsolescence in the Salem Plaza layout due to the fact that it is only a small part of a proposed major development for which it had been originally designed.

(f) At the time the Salem Plaza was projected, its potential competition was found only in the Capitol Shopping Center (the site of the Sears, Roebuck store), a strip in the Candalaria area on South Commercial Street, and State Finance's center on Market Street. After Salem Plaza began operations, it has had to meet new competition from two Fred Meyer stores, the Lancaster Mall, K Mart, and Valu-Mart, all well-designed, well-financed operations outside the core area with easy access and adequate parking.

The defendant, in rebuttal, quoted the oft-repeated adage that "one sale doesn't make a market." This rule-of-thumb is supported by a number of cases holding that the sale price of a specific item of real estate is not conclusive as to its fair market value. *State v. State Tax Commission,* 393 SW2d 460 (Mo 1965); *Josten-Wilbert Vault Co. v. Board of Equalization,* 179 Neb 415, 138 NW2d 641 (1965); *Stein v. State*

*Tax Commission,* 379 SW2d 495 (Mo 1964); *Rek Investment Co. v. Newark,* 80 NJ Super 552, 194 A2d 368 (1963). In this court's view a single sale may be some indication of market value, but it is suspect. *Kem v. Dept. of Rev.,* 5 OTR 178, 182 (1973). This is especially true when the subject property constitutes the sale (although the defendant, in its administrative rule, OAR 150-308.205 (A) b, indicates that such sales are "relevant"). "Market value" is not necessarily value to the owner. See, generally, I Bonbright, *Valuation of Property,* 14-15, 91, 472-479 (1937). For example, it is recognized that a given property may be "overbuilt" to the owner's satisfaction, without enhancing its market value. ORS 308.205 requires the assessor to find "market value," not "owner's value."

█ The weight of plaintiff's testimony is affected by the fact that its sole stockholder relied upon his own rule-of-thumb capitalization rate in a crudely devised income approach, using it with respect to the fee and also to long-term leases, which are binding for many years and which require a regular increment in the rental amounts. He failed to look to the local market and testified to his unfamiliarity with it.

The plaintiff having admitted his ignorance of local land values, the best evidence adduced of the land value of subject property was that of the assessor and the defendant, $955,000. Subtracted from the plaintiff's total value of the property, $1,250,000, only $295,000 is left for the store building, completed at a cost of not less than $1,300,000 only four years before the assessment. Even allowing for the economic obsolescence to which the property manager testified, such a reduction in value of this modern, substantial structure is not supported by the testimony.

██ ██ An acceptable income approach, properly used, is highly technical and requires much detailed data. *Feves v. Dept. of Revenue,* 4 OTR 302, 303-305 (1971). Plaintiff's direct testimony is sparse in data needed to establish the relationship of the subject property and other properties in the area which compete for an investor's capital. It does not give sufficient consideration to the "market" which the assessor, for tax purposes, is required to examine to justify his values. The plaintiff overlooks the requirement imposed upon the assessor to set a value upon the property as a whole, determining a relationship to other like properties in order that tax levies will be properly apportioned among different owners. Since the assessor is valuing the property as a whole, for tax purposes, he may not take into account the effect of leases which might be a substantial factor in the mind of a particular buyer. *Swan Lake Mldg. Co. v. Dept. of Rev.,* 257 Or 622, 478 P2d 393, 480 P2d 713 (1971).

██ The defendant's testimony, also, is somewhat equivocal. In support of its determination of a $1,700,000 value (land, $955,000, improvements, $745,000), the defendant offered as its only witness the county assessor's chief appraiser. However, this officer, from the inception of the question of the value of the subject property before the board of equalization, has persisted in his opinion that the true cash value of the fee interest in Block 24, Salem, was $2,200,000, allocating $955,000 to the land and $1,245,000 to the improvements. The court, reviewing the witness's oral testimony, most of which was repeated in the written data supplied in his appraisal report, agrees that the market data approach to value was unavailable, since no sales of comparable property could be found, and also agrees that the cost approach

for the improvement was nullified by the special problems arising from the entrepreneur's diminution in the original plans for the project after the construction of the improvements on Block 24 had begun which, with alterations required by lessees, greatly affected the expense of construction. The witness could choose only to use a recognized income approach to value and he properly used economic rents as a basis therefor in place of the subject property's actual rents (thus seeking a basis in the market, reducing the variables of goodwill and management). Nevertheless, the court does not find the witness's conclusions of value ($955,000 for the land, $1,245,000 for the improvements, for a total of $2,200,000) wholly convincing.

For example, the court finds that the subject property, although frequently designated in the testimony as a "shopping center," fails to come strictly within that definition as generally understood by knowledgeable investors and appraisers. The typical shopping center consists of a number of specialty shops grouped around or between leading volume merchandisers with a varied line of goods (preferably well-known department stores), with all the lessees sharing a number of amenities, with emphasis on easily entered and fully adequate parking facilities. The defendant's witness constantly stressed that Meier & Frank and the Pay Less Drug company are adjacent to the subject property and the court has no doubt that each retailer obtains certain benefits from the presence of the others, as it is true of all the downtown core area activities. However, the immediacy, ease and accessibility of each retailer's site to the pedestrian shopper is lacking in the three blocks used by Pay Less, the subject property, and Meier & Frank, separated by busy streets and a negative traffic pattern and, in

consequence, possibly the most important feature of a shopping center is thus lost. The defendant's witness gave no weight to this factor.

In his discussion of economic rents, the defendant's witness stated that if the subject property were vacant at the present·time, higher minimum rentals could be obtained. The court has already expressed its approval in this opinion as to the use of economic rentals as opposed to actual rentals but believes that examples of competition should have been found in the leases of other retail stores and in the use of other shopping centers but, in the latter instances, with substantial adjustments to compensate for the elements of economic obsolescence which have been hitherto specified. Instead, the witness relied upon leases of office buildings, restaurants, a post office, and only one shopping center, the Lancaster Mall (the last named having all or most of the advantages lacking in the subject property).

In his choice of a capitalization rate, the witness relied chiefly upon the comparative method, under which the appraiser ascertains the sales price of several properties allegedly similar to the property being appraised, and the income from such properties. He then computes the ratio of income to sales price and such ratio indicates the capitalization rate on each piece of property. As observed in *Encyclopedia of Real Estate Appraising* 42 (Friedman ed, rev & enlarged ed 1970), this method may lack accuracy in that it considers only the *quantity* of income from the investment, and does not concern itself with other *qualities* of a sound investment, such as safety of principal, reliability of income, duration of the investment, saleability of the property, freedom from care, the poten-

tial for appreciation in value, and the like. In the court's view, the negative aspects of the subject property call for some modification of the capitalization rate in recognition of these factors in the subject property, as well as the less-than-optimum comparability of the properties utilized. The witness's failure to discuss or estimate depreciation or capital recapture, as an aspect of the rate, applicable to the improvements, based upon the economic life of the improvements, is regretted. They can be highly significant. See *Encyclopedia of Real Estate Appraising, supra,* at 396-397.

■■■ A high rate of capitalization is justified for a shopping center faced with the competition which has developed in the Salem area subsequent to the date of the construction of Salem Plaza. See *Encyclopedia of Real Estate Appraising, supra,* at 411.

■■■ In looking for sources of market value, the appraiser must always be objective and concerned with the behavior and desires of the market, not his own subjective tastes or standards or those of his friends. *Encyclopedia of Real Estate Appraising, supra,* at 22. The appraiser's report, apparently developed and augmented in a series of contests, is argumentative as well as factual. Such failure of objectivity renders it less forceful.

In view of the foregoing, the witness's testimony favoring a total value of $2,200,000 is discounted and the value set by the Department of Revenue and its order are affirmed.