# PHILLIP E. PRICE
## *v.*
# DEPARTMENT OF REVENUE

Plaintiff Phillip E. Price appeared in propria persona.

James D. Manary, Assistant Attorney General, Salem, represented defendant.

Walter F. Brown, Esq., Lake Oswego, appeared as amicus curiae.

Decision for defendant rendered January 24, 1977.

CARLISLE B. ROBERTS, Judge.

Plaintiff has appealed from the Department of Revenue's Order No. VL 75-666, executed on January 2, 1976, seeking the reduction of the assessed value of a house and lot located in Gladstone, Clackamas County, Oregon, the County Assessor's Account No. 22644-2-5 (Tax Lot 1008 in Map 2 2E 17DA). The improved property, containing the plaintiff's newly built personal residence, was purchased in July 1974 for $36,000. The county assessor had established the true cash value of the property as of January 1, 1975, at $41,230 but this was reduced by the county board of equalization to $39,850 on plaintiff's petition. The plaintiff appealed to the defendant for a further reduction to $36,500 but the defendant affirmed the value set by the board of equalization and the plaintiff has appealed to this court pursuant to ORS 306.545. In plaintiff's amended complaint, he pleaded (1) that the true cash value of the property as of January 1, 1975, was $36,500 and (2) that the plaintiff had been subjected to arbitrary and systematic discrimination contrary to the provisions of the U. S. Constitution, Amendment XIV, respecting the equal protection of the law and equal privileges and immunities, and also to the uniformity clauses of the Oregon Constitution, Art I, § 32, and Art IX, § 1.

The plaintiff represented himself before the court and called only two witnesses, both adverse to his position. By leave of the court, Walter F. Brown, Esq., of Lake Oswego, a professor of law at Northwestern School of Law, Portland, appeared as amicus curiae in respect to the constitutional issue.

The subject property is located at 7555 Springhill Drive, at the eastern end of the City of Gladstone. All of the neighboring homes have been built within the

last five years and the area is strictly residential, containing homes priced from $30,000 to $50,000. The streets are 50 feet wide, with asphalt paving and curbs, and the property is served by public water, sewers and natural gas. It is reasonably close to schools and to shopping centers but free of traffic congestion. Springhill Drive is a dead-end street.

In former years, the plaintiff was a real estate salesman, operating his own office, and showed himself conversant with factors which add to or detract from residential property value. However, plaintiff admitted that he was not fully conversant with the "market" and the testimony which he presented showed that the "market," to him, was based upon his study of the subject property and two adjacent homes built by the same contractor and whose appraisals and assessment by the county had been carefully studied by him.[1]

A review of the pleadings and of plaintiff's own testimony and his examinations of two adverse witnesses indicate that he first felt that the assessed valuation placed upon his property must be incorrect because he could not understand why a property bought by him on July 10, 1974, for $36,000 could properly be assessed as of January 1, 1975, at a value of $41,230. He was successful in obtaining a reduction to $39,850 in his appeal to the county board of equalization but, because of a number of other matters which his studies had revealed, he felt certain that he

---

[1]The plaintiff made the common assumption of laymen that all assessments by the county assessor, except his own, equaled true cash value. The determination of "true cash value" is the objective which, by law, must be sought by both the county assessor and his staff and by the taxpayer who challenges the county assessor's values. However, the court must be convinced by a preponderance of the evidence that the measure of true cash value on which the witness relies is reasonably accurate, and no presumption of accuracy extends to the assessments of the property of plaintiff's neighbors. *J. R. Widmer, Inc. v. Dept. of Rev.,* 261 Or 371, 494 P2d 854 (1972). The present case is quite similar to *Widmer v. Department of Revenue,* 4 OTR 361 (1971). A reading of that decision will aid the plaintiff herein in understanding the decision in this case. Helpful material is also found in 9 Willamette LJ 193 (1973).

was still being subjected to tax based upon an incorrect appraisal. An item of particular interest to him was the fact that the assessor's office data showed that the county's appraiser had indicated "double construction" for the plaintiff's house when, in plaintiff's view, "single construction" would have been appropriate. He also felt that the assessor had not taken into account differences in building expense of comparable neighboring houses (involving metal lifetime siding, brick fronts and shake roofs, which were more costly than the comparable parts of his own house).

Plaintiff was also concerned about the use by the county assessor's office of a five percent "trending factor" which was applied to all other residential property in the county and the use of a one percent per month increase in value over purchase price to arrive at an assessed value for other new homes in plaintiff's immediate neighborhood. As the testimony indicated, a "trending factor," which is developed by study of a large number of property sales, is used by the assessor to reflect a general increase in value of particular types or classes of property over a large area, which are already on the assessment rolls, during the period of time since the last assessment. The one percent per month adjustment for time was made in assessment of new homes which were not on the previous year's roll, reflecting the increase in value over the sales price from the date of construction to the assessment date. The amount of adjustment was determined by a study of the difference in sales prices of specific properties which, unchanged, had been sold two or more times in the same tax year.

Although plaintiff readily proved that he purchased his property for $36,000 and that no real estate commission figured in the sale, inasmuch as he bought from the building contractor, he was convinced that the assessor had added to the value of his property the equivalent of a sale's commission and an erroneous amount attributed to the addition of top soil to his lot.

The witnesses upon whom he relied to prove his case (in addition to his own sworn testimony) were Mr. Ray R. Hamersley, an appraiser and appraisal supervisor in the county assessor's office since 1969 and a licensed real estate salesman since 1963, and Mr. George Malin, the chief appraiser in the office of the Clackamas County Assessor, an appraiser of many years' experience and a student of the subject who had completed numerous courses in property appraisal.

Mr. Hamersley submitted an appraisal of the subject property and of comparable properties, using the market data approach, substantially confirming the value set upon the subject property by the board of equalization. In his appraisal, he took into account and made adjustment for types of contruction, the inclusion or noninclusion of fireplaces, the number of bedrooms, the type and quality of roofs, the type and quality of siding, the presence or nonpresence of brick trim (using the standard cost factor book, distributed under the aegis of the Department of Revenue, pursuant to ORS 308.275, and adjusted for time), the size of the lot, making the usual adjustments for time from date of sale for depreciation, where applicable, and the like.

There was testimony that, in the view of the county's appraisers, the "single construction" of the subject property had the equivalent of "double construction" because of insulating features; that differences in building expenses because of siding, brick fronts and shake roofs had been taken into account (the testimony as to the roofs indicating that they were not given the value in the marketplace that was attributed to them by the plaintiff).

The county's appraisers also testified that the market value of the subject property had not been determined initially by adding on a real estate commission or by adding a value for the addition of top soil to the lot. The testimony, which was accepted by the court, indicated that during the plaintiff's questioning

of the value given to the property by the county's appraisers, one or another of them had sought to demonstrate to him that the property was not over-valued by simply "building up" a value based upon a contractor's building costs as found in the cost factor book plus cost of lot plus cost of a realtor's fee (which all sellers contemplate as part of the sale's price, whether required by sale through a realtor or retained by the seller) plus costs of improvements to the lot through landscaping, and all the other amenities which may be involved in the sale of a house. This "build up" method was not used by the appraisers in the actual appraisal in the present case. When utilized for illustrative purposes, it had not been understood by the plaintiff.[2]

The plaintiff also indicated impropriety on the part of the county assessor's appraisers because they re-vised their presentation following their experiences in the board of equalization and the Department of Revenue hearings. However, ORS 305.425 particular-ly provides:

"(1) All proceedings before the [tax] court shall be original, independent proceedings and shall be tried without a jury and de novo."

■ If either the taxpayer or assessor can improve his case, as he moves from successive administrative hearings to the court, by using new approaches (jus-tified by further study) or offering stronger compar-able sales (discovered through greater diligence), these changes in presentation are permitted under the statutory provision for a presentation "de novo," so long as they aid in reaching the goal of true cash value.

The court feels strongly that the time and effort spent on this case was lamentable. There was a failure

---

[2]Although the county board of equalization, on plaintiff's petition, reduced the assessed value of $41,230 to $39,850, the plaintiff adverted to the original figure in his amended complaint in this court and spent a substantial time needlessly disproving matters which related only to the original assessment.

of communication between government and taxpayer; *i.e.,* between the assessor's staff and the plaintiff. This failure led to a lawsuit. The plaintiff, understandably but regrettably, lacked the indispensable background required to present a property tax case to a court. As an aid to others so situated, the court cautions that a potential plaintiff can avoid a measurable degree of frustration by acquainting himself in advance with the basic requirements of the property appraisal process for tax purposes. While only superficial suggestions can be offered here, laymen seeking to represent themselves and to present their cases unaided should note:

█ In every step of the appraisal process, "market value" or "true cash value" shall be the goal (the terms are equivalent, under law). In its published rule, OAR 150-308.205-(A),[3] the Department of Revenue gives the definition:

"a. Market Value as a basis for true cash value shall be taken to mean the highest price in terms of money which a property will bring if exposed for sale in the open market, allowing a period of time typical for the particular type of property involved and under conditions where both parties to the transaction are under no undue compulsion to sell or buy and are able, willing and reasonably well-informed."

█ Time requirements and budget limitations have caused Oregon counties, with legislative sanction (ORS 308.215(1)(c), 308.590(4), and 309.028, as amended in 1971) and under the direction of the Department of Revenue, to make use of trending and "indexing," to keep most property values reasonably current. Through the use of sales data from the area, trending factors and other indicators of changing property values are developed and applied during the four-, five- or six-year intervals between physical reappraisals of individual properties in the several

---

[3]The Department of Revenue's rules have the force of law. They are published by the Secretary of State as "Oregon Administrative Rules," pursuant to ORS 183.310-183.500 (the Administrative Procedure Act).

counties. *See* ORS 308.234. When a particular property is appraised on an individual basis, either because the property has not been on the tax roll or because a property owner is contesting its assessed value, the skilled appraiser will not rely on a mass appraisal and he will make a complete physical reappraisal of the property. *Astoria Plywood Corp. v. Dept. of Rev.*, 6 OTR 57 (1975). If possible, he will use the market approach to support his valuation. In the courts, this is the method preferred. *Portland Canning Co. v. Tax Com.*, 241 Or 109, 404 P2d 236 (1965).

■■ To support their respective opinions of value, both the taxpayer and the assessor must present evidence of the "market" for a particular property by the identification of sales of comparable property in the area on or near the assessment date. Each side has a burden to support its asserted value, so that the court may determine "true cash value" as of the assessment date. (Since there is no presumption of assessment validity, the tax administrator is well advised to make a prima facie case. *See J. R. Widmer, Inc. v. Dept. of Rev.*, 261 Or 371, 494 P2d 854 (1972).)

■ As has often been said, "true cash value" is a range of value, rather than an absolute. Although not a rule of law, it is generally accepted that appraisers will be deemed equally competent and their testimony useful if, acting independently, they come within 10 percent of each other in the ordinary case. *See Pacific Building v. Commission*, 2 OTR 52 (1965); *Lundeen v. Commission*, 2 OTR 13 (1964). Note is taken that, in the present instance, the plaintiff set himself an almost impossible task by seeking in this court a reduction in value of a personal residence which was within eight percent of the assessed value as established by the county board of equalization and the defendant! A person experienced in property valuation, having convinced himself that a 10 percent differential or less was involved, would ordinarily seek to dissuade a client from an appeal.

The recognition of a range or band of value within the contemplation of market value is forced by the highly subjective nature of the appraisal process, requiring judgment values of the appraiser step by step. This weakness in turn has given rise to "accepted" approaches to value, the most typical of which are loosely described as the market data approach, the income approach, and the cost (less depreciation) approach. Each of these must be used with care and understanding—and experience is a great teacher.

■ Because of these inherent difficulties, courts also recognize that taxation is necessarily a practical problem and complete equality and uniformity must remain an ideal. Relative, not absolute, uniformity is required by the constitutional provisions. *Robinson et ux v. State Tax Com.,* 216 Or 532, 536, 339 P2d 432, 434-435 (1959); *Portland Van & Storage Co. v. Hoss,* 139 Or 434, 446-447, 9 P2d 122, 127 (1932); *Thomas v. Commission,* 3 OTR 333, 337 (1968).

The courts thus take note of the problems of administrative feasibility inherent in the work of governmental assessment and tax agencies. Countless variations in facts require us to be content in applying tax statutes with "rough approximations rather than precision." *See Capitol Greyhound Lines v. Brice,* 339 US 542, 546, 70 S Ct 806, 809, 94 L Ed 1053, 1057, 17 ALR2d 407 (1950). The court's task of scrutinizing tax statutes is a task of drawing lines. *See Freeman v. Hewit,* 329 US 249, 252-253, 67 S Ct 274, 276-277, 91 L Ed 265, 271-272 (1946).

All of the foregoing considerations must be made consistent, so far as is humanly possible, with the basic purpose of appraisal and assessment of property: that all taxpayers share in proportion to their assessments, the support of their government and the protection and services afforded to their property and to themselves, and that none bears an added or unfair burden by reason of other taxpayers not paying their just share.

The court's apologia for such a lengthy discussion of fundamentals is that stated by Mr. Justice Kelly in *Columbia Auto Works v. Yates,* 176 Or 295, 319, 156 P2d 561, 570 (1945):

> "We have given this appeal very careful consideration and have discussed it thus at length, not only because of its importance to the parties, but because we realize the handicap under which a party strives who acts as his own attorney."

The amicus curiae has pointed out that the defendant's principal witness had relied on comparable sales that might not have withstood the rigors of a vigorous cross-examination. The court recognizes the truth of this but observes that the plaintiff was not trained in such skills and the record shows no effective impeachment of the bulk of the testimony. The court is bound by ORS 305.427:

> "In all proceedings before the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief and the burden of going forward with the evidence shall shift as in other civil litigation."

Based upon the preponderance of the evidence, defendant's Order No. VL 75-666 is affirmed in all respects. The true cash value of subject property on January 1, 1975, is found to have been $39,850. Defendant is awarded its statutory costs and disbursements.

Inasmuch as the evidence presented did not support plaintiff's allegation of unconstitutional discrimination, no discussion of that issue will be useful. *Cf. Freightliner Corp. v. Dept. of Rev.,* 275 Or 13, 549 P2d 662 (1976).