IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| KENT D. VORONAEFF, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 110361C |
| | ) | |
| v. | ) | |
| | ) | |
| CROOK COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

This case involves the real market value (RMV) of three unimproved lots in Central

Oregon, identified as account numbers 17098, 17850, 17234 (subject properties). The tax year at

issue is 2010-11. Trial was held by telephone September 21, 2011. Plaintiff Kent Voronaeff

(Voronaeff) was represented by David E. Carmichael, attorney at law. Defendant was

represented by Valerie Toledo (Toledo), Appraiser 2, Crook County Assessor's office. Trial

lasted 3.5 hours.

I. STATEMENT OF FACTS

The subject properties are located in Brasada Ranch, a newly created subdivision in the

city of Powell Butte. Brasada Ranch is an 1800 acre destination resort community, located

approximately 25 miles from the towns of Bend, Prineville and Redmond. (Def's Ex A-4.) The

resort includes an 18 hole, par 72 golf course, a full-service, 13,260 square foot clubhouse with

an outdoor swimming pool, two hot tubs, massage rooms, separate men's and women's lounges,

a conference room, and a high-end full-service restaurant. (*Id*.) There is also a full-service golf

pro shop, a 17,000 square foot athletic center with two oversize outdoor swimming pools that

feature a waterslide and a "lazy river," a grotto with a waterfall and five hot tubs. (*Id*.) There is

also an equestrian Center with a 65,000 square foot indoor arena, an outdoor riding arena, and

more than 900 acres of riding trails. (*Id.*)

The subject properties are three unimproved lots identified in the assessor's roll as Accounts 17098, 17850, 17234. Their respective subdivision lot numbers (not to be confused with map lot numbers) are 167, 288, and 57. (Ptf's Ex 1 at 4, 11, 15.)

Plaintiff purchased Lot 167 in April 2010 for $47,500, Lot 288 in July 2010 for $31,500, and Lot 57 in July 2010 for $34,500. (*Id.* at 2, 8, 18.) Plaintiff testified that he purchased all three properties through a real estate agent marketing the property for a local brokerage firm hired by Bank of America, who held title to the properties following an earlier foreclosure. The RMVs on the assessment and tax rolls, for the subject properties, as of January 1, 2010, were $162,800 (Lot 167), $123,730 (Lot 288), and $92,800 (Lot 57), which is three to four times the amount paid by Voronaeff. (Ptf's Compl. At 2-4.)

In his Complaint, Plaintiff requested reductions in the RMV of the subject properties to the purchase prices for each of the three lots: $47,500 for Lot 167, $31,500 for Lot 288, and $34,500 for Lot 57. (*Id.* at 1.) At trial, however, Plaintiff's counsel informed the court that he would accept an RMV of $65,000 for each of the lots based on the range of value indicated by Plaintiff's 10 comparable sales and adjustments to the purchase prices for the three subject properties.

Defendant appraised the subject properties for trial using the comparable sales approach, and determined RMVs slightly higher than the roll values: $165,000 for Lot 167, $125,000 for Lot 288, and $100,000 for Lot 57. However, Toledo testified that Defendant is only requesting the court sustain the current roll values of $162,800 (Lot 167), $123,730 (Lot 288), and $92,800 (Lot 57).

Plaintiff (Voronaeff) presented evidence regarding the sale history for the subject properties and 10[1] comparable sales. (Ptf's Ex 1 at 1-56). Voronaeff testified about his purchase

---

[1] Plaintiff included 12 comparable sales in its exhibits, but at trial realized that two of those sales, comps 3

of the subject lots under appeal, and the 10 comparable sales, all of which were identified as "foreclosure" sales. As indicated above, Voronaeff purchased Lot 167 for $47,500 in April 2010, Lot 288 for $31,500 in July 2010, and Lot 57 for $34,500 in July 2010. All of those purchases occurred after the applicable assessment date of January 1, 2010. Voronaeff testified that he purchased the properties as an investment. Voronaeff testified that he resold Lot 167 in shortly before trial (on or about August 2011), approximately 16 months after he purchased it, for $55,000, which is $7500 more than he paid for that lot in April 2010. However, Voronaeff testified that he lost money on the sale due to the cost to carry the property during his ownership ($3,400 in HOA fees, $2,000 for reserved right to use of golf course - see below), a $3,500 broker's commission, and property taxes.

Voronaeff's ten comparable sales sold between December 2009 and August 2010 for prices ranging from a low of $24,000 (comp #10) to a high of $66,500 (comp #8). Only one of Voronaeff's ten sales occurred in 2009 (December), and 6 of the 10 sold between June 25, 2010, and August 23, 2010. However, three of Voronaeff's comparable sales were on the market for a considerable length of time before a sale occurred (280 days for comp #1, 237 days for comp #2, and 315 days for comp #4). Moreover, the first two comparables were listed for $200,000 and $225,000, respectively, in July 2009 and April 2009 – six or more months before the assessment date. Voronaeff's comp #1 sold in April 2010 for $65,000 and comp #2 sold in December 2009 for $40,000.

The court found Voronaeff to be duly qualified to render a value opinion because he grew up in a real estate family. His father was an MAI Appraiser and he and his brother worked for their father from the time they were in high school. More importantly, Voronaeff has a

and 11, were sales of the lots under appeal. As such they are not comparable sales. Thus, Plaintiff has 10, not 12, comparable sales.

bachelor's degree and a master's degree in business and finance, is a licensed real estate broker, and an MAI-designated appraiser. Voronaeff testified he also owns other golf course property and has purchased approximately eight lots in the past two years. Voronaeff, however, was careful to point out that he was not testifying in his capacity as a broker or appraiser, but simply as a property owner with knowledge and experience buying and selling real estate, and in property valuation methodology.

Voronaeff testified that the purchase prices for the subject properties set forth in the exhibits (as well as the Complaint) did not include a fee of $2000 he paid for each of the three lots to ensure that a future buyer of the lots would have the right to membership in the golf course. Voronaeff also paid a commission of $3500 for each lot and has paid, and continues to pay, $200 per month for each of the three lots. The $200 monthly amount consists of $75 for homeowner association (HOA) fees and $125 for mandatory "athletic fees." Voronaeff testified that he bought the properties as an investment, as he was encouraged, at least in part, by the favorable financing offered by Bank of America for a nominal five percent down payment.

Defendant submitted three exhibits (A, B, and C), each over 40 pages in length – one for each lot (167, 288, and 57 respectively). In determining the RMV for the subject properties Defendant relied on the comparable sales approach. (Def's Ex A at 15; Ex B at 17; Ex C at 18.) Defendant's appraiser Toledo used sales data from five comparable properties, all within the same community as the subject properties (Brasada Ranch). (Def's Ex A at 6; Ex B at 6-8; Ex C at 7-9.) Of the five comparables, two are foreclosures and one a "short sale."[2] (*Id.*) Toledo contends that neither foreclosure sales nor short sales are considered true arm's length transactions. (*See* Def's Ex A at 17.) To adjust for the asserted purchase price discrepancies

_____

[2] A "short sale" is a real estate transaction in which the sale of real estate is for less than the amount of the seller's outstanding obligation on the property. OAR 441-910-0000(3)(a) (2009).

between those sales and transactions Defendant considers "market," Toledo applied a 40 percent

upward adjustment, based upon sales data from 2009. (*Id*.) Toledo also calculated a "Time

Trend" adjustment of 3.5 percent per month, and "View Adjustment[s]" varying from a negative

29 percent for a comparable deemed far superior to Plaintiff's Lot 57 (Def's Ex C at19, comp #3)

to a positive 14 percent for a comparable deemed inferior to Plaintiff's Lot 167 (Def's Ex A at

16, comp #3). Defendant estimated the values of Plaintiff's three lots to be $165,000 for Lot

167, $125,000 for Lot 288, and $100,000 for Lot 57. (Def's Ex A at 2; Ex B at 2; Ex C at 2.)

## II. ANALYSIS

The issue before the court is the subject properties RMV as of January 1, 2010. ORS

308.205(1)[3] defines RMV as:

> "Real market value of all property, real and personal, means the amount in
> cash that could reasonably be expected to be paid by an informed buyer to an
> informed seller, each acting without compulsion in an arm's-length transaction
> occurring as of the assessment date for the tax year."

RMV is determined by the particular methods and procedures adopted by the Department

of Revenue. ORS 308.205(2). There are three approaches to valuation (income, cost, and sales

comparison) that must be considered when determining the RMV of a property. *Allen v. Dept. of

Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); see also OAR

150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three

approaches may not be applicable to the valuation of the subject property). The valuation

approach to be used is a question of fact to be determined on the record. *Pacific Power and

Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979).

In this case, Defendant has an appraisal while Plaintiff does not. Plaintiff does have

fairly recent purchase prices, although the properties were acquired after the applicable

---

[3] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to
2009 unless otherwise noted.

assessment date. Plaintiff also has comparable sales. The lack of an appraisal is not fatal because the Oregon Supreme Court has ruled that "[t]he various approaches to valuation * * * are only the vehicles used to determine the ultimate fact – market value." *Kem v. Dept. of Rev.,* 267 Or 111, 114, 514 P2d 1335 (1973). The court in *Kem* ruled further that "[a] recent sale of the property in question is important in determining its market value." *Id.* Purchase price is not necessarily the "value" of a property, although it is often a good indicator of a property's value. This court has previously noted that value is a range rather than an absolute. *Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977).

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC–MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed. 2001)). Both parties have relied primarily on the sales comparison approach in their determination of RMV in this case, which concerns the value of vacant land. (Pft's Ex 1; Def's Ex A at 15; Ex B at 17; Ex C at 18.)

In employing the sales comparison approach the "court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject party. *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 *3 (Mar 26, 2003). In evaluating the competing evidence, the court looks to the comparability of the different sales and the application of all necessary adjustments for differences. Adjustments are a key component in evaluating properties. According to *The Appraisal of Real Estate*:

> "Ideally, if all comparable properties are identical to the subject property, no adjustments will be required. However, this is rarely the case * * *. After researching and verifying transactional data and selecting the appropriate unit of comparison, the appraiser adjusts for any differences."

Appraisal Institute, *The Appraisal of Real Estate* 307 (13th ed. 2008.)

/ / /

DECISION  TC-MD 110361C                                                                                          6

Both parties have used foreclosure sales as part of their market evidence.  However, they disagree on how to use "foreclosure" sales in estimating the RMV of the subject properties.  The Department of Revenue (Department) promulgated a rule providing that if a sales comparable constitutes a "nontypical market transaction," then such a "transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition."  OAR 150-308.205-(A)(2)(c) (the rule lists "duress, death, foreclosures, interrelated corporations or person, etc." as examples of "nontypical market transactions.")  The rule indicates that "foreclosure" sales represent "nontypical market transactions," and if used in valuing a property under the sales comparison approach, they should be adjusted, as Defendant has done in its appraisal.  (*Id.*; *See also* Def's Ex A at 16; Ex B at 18; Ex C at 19, where Defendant employs its adjustment methodology to the foreclosure sales and the short sale.)  However, Plaintiff argues that adjustments are unnecessary in this case because "foreclosure" sales were not "nontypical," but rather typical transactions, given the state of the local economy in the months leading up to and following the January 1, 2010, assessment date.

The Appraisal Institute explains that the term "arm's-length" involves "[a] transaction between unrelated parties under no duress."  Appraisal Institute, *The Appraisal of Real Estate* 305 (13th ed. 2008).  This court has been reluctant to consider "foreclosure" sales as "arm's-length transactions" because such sales "may well involve an element of compulsion on the part of the seller."  *Kryl v. Lane County Assessor*, TC-MD No 100192B, WL 1197444 *2 (Mar 30, 2011); *see also Knight Bridge Crossing, LLC v. Washington County Assessor*, TC-MD No 110238N, WL 176682 *4 (Jan 23, 2012); *Yarbrough v. Marion County Assessor*, TC-MD No 070229C, WL 4440216 at *4 (Dec 12, 2007).

In *Kryl*, the court rejected the taxpayer's foreclosure sale, which was the taxpayer's purchase of the subject property, even though it was close in time to the assessment date.  *Id.*

The court in *Kryl* held that the taxpayer failed to meet his burden of proof, stating that "[p]laintiff offered no competent evidence other than his own purchase price to support his *belief* that his purchase price was the subject property's real market value." *Id.* (emphasis added). However, value is ultimately a question of fact, and the court relies on the evidence presented in a particular case to determine RMV. *Chart Development Corp. v. Dept. of Rev.*, 16 OTR 9, 11 (2001) (citation omitted).

The Oregon Supreme Court, in *Ward v. Dept. of Revenue* (*Ward*), recognized that property purchased through foreclosure may be considered "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward*, 293 Or 506, 508, 650 P2d 923 (1982). This court has also held that "[t]here are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk v. Lane County Assessor*, TC-MD No 110308, WL 6182028 *5 (Dec 12, 2011). Such an exception may be recognized by the court "where the majority of sales are distress, it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985).

And, more recently, the Department of Revenue (Department) has approved the use of foreclosure and short sales in property valuation. Plaintiff submitted a Memorandum (Memo) dated January 21, 2009, written by the Department that the Department sent to all county assessors in this state. Defendant submitted a letter from the Department dated February 1, 2010, sent to the Crook County Assessor on the use of short sales in determining market value. The letter provides in relevant part:

> "We recommend you analyze all sales, foreclosure, short or otherwise, and
> determine if they represent market conditions. If elements of a particular sale
> raise reasonable doubt that the sale doesn't represent the market, prevailing
> wisdom suggests eliminating that sale in the market value study. However, in a

declining market, foreclosures and short sales are common and in many cases can and should be used in market value studies. *If*, in your opinion, *the current economics and market conditions, as of the valuation date, indicate some level of distress is a common market characteristic, it is appropriate to include such sales* in a comparable sale's value analysis or a ratio study."

(Dept's Feb. 1, 2010 letter at 1.) (Emphasis added).

The Memo also endorses the use of "short sales" in the appropriate situation. The Memo states in part:

"'Short sales' should be carefully reviewed to determine if they meet the relevant criteria for a comparable. The mere fact that there is, presumably, some duress on the part of the seller (the upside down owner) that prompts the sale, does not itself disqualify the transaction from consideration, especially when there is some duress in the market. This situation is analogous to the owner losing his job and selling because he can't make the mortgage payments. *We wouldn't discount that sale simply because the owner was very motivated to sell* (some duress) so long as the sale was an arm's-length with adequate exposure and contained no unusual financing terms or elements that couldn't be adjusted out."

(Dept's Jan. 21, 2009, Memo at 2.)

Finally, the last two sentences of that Memo state:

"The job of assessment officials is to place RMV in the range of market values. If the county chooses to ignore valid market evidence of value as the basis for its appraisals and related ratio studies, it will both encourage more appeals and it will set itself up for losses at the boards and in the court."

(*Id*. at 3.)

Plaintiff's testimony, and the parties' evidence, show that on January 1, 2010 the local economy surrounding the subject properties was in dramatic decline. In 2009 half of the bare land sales (seven of the 14 sales) in the subdivision where Plaintiff's lots are located (Brasada Ranch) were foreclosure sales. (Def's Ex A at 19.) Defendant testified that in 2010 that figure increased to 89 percent (32 of the 36 sales). Defendant's appraiser used foreclosure sales in her appraisal. (Def's Ex A at 16; Ex B at 18; Ex C at 19.) Plaintiff has also shown that the decline in real estate prices continued throughout 2010. (Ptf's Ex 1 Cover Sheet at 2.) Toledo testified that the average sale price for an arm's-length market transaction during this time period was

$89,000 and the median sale price was $81,500, and that the average and median foreclosure sales prices were $74,500 and $75,000. These price figures are roughly half of what Defendant estimated as the RMV of Account 17098, as well as the adjusted comparable sales figures that Defendant uses in its value determination. (Pft's Compl. at 2; Def's Ex A at 16; Ex B at 18; Ex C at 19.)

By statute, Plaintiff has the burden of proof and must establish an error in the record assessment by a "preponderance" of the evidence. ORS 305.427. This court has previously ruled that a "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971); *see also Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 394, 737 P2d 595 (1987) (where the Oregon Supreme Court explained that the derivation of the word "preponderance" is Latin in origin and "translates to 'outweigh, be of greater weight.' "). "Plaintiff must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

Here, Plaintiff presented the purchase price for each of the three properties at issue, plus ten comparable sales. As stated earlier, all of the sales are foreclosures. Plaintiff paid between $31,500 and $47,500, to buy one of the lots in April 2010 and the other two in July 2010. Plaintiff's 10 comparable sales sold between December 2009 and August 2010 for prices ranging from a low of $24,000 to a high of $66,500. While most of the comparables sold after the assessment date, the first two comparables were listed for $200,000 and $225,000, respectively, in July 2009 and April 2009 – six or more months before the assessment date. Voronaeff's comp #1 sold in April 2010 for $65,000 and comp #2 sold in December 2009 for $40,000. Those

properties were exposed to the market for a reasonable length of time, including the summer months of 2009, and sold for considerably less than the asking price. That evidence suggests to the court that there is an error in the record assessment.

Defendant submitted a lengthy appraisal for each of the lots that supported the current values on the rolls. Defendant estimated the values of Plaintiff's three lots to be $165,000 for Lot 167, $125,000 for Lot 288, and $100,000 for Lot 57. However, the court is not persuaded by the 40 percent "foreclosure adjustment." Notwithstanding Toledo's lengthy narrative explaining her foreclosure adjustment, in the end it is apparent that Defendant developed that figure primarily from a single paired sale involving a property bought through foreclosure for $100,500, and then resold a month later for $140,000. (Def's Ex A at 17.) While the court agrees that foreclosure sales can be inconsistent with true market transactions, the court is reluctant to rely on a single transaction to effectively establish an adjustment to an entire segment of the market. *Kryl* at *2; *Equity Land Res. V. Dept. of Rev.*, 5 OTR 222, 230 (1973) (stating that "[i]n this court's view a single sale may be some indication of market value, but it is suspect.")

The court is also concerned that Defendant made no adjustments for differences in the sizes of the various lots. Some of Defendant's comparables appear considerably larger than the subject properties. Moreover, Defendant's value conclusions for Lots 288 and 57 are simply Toledo's adjusted sale prices of the one market transaction she used in valuing those two properties. (Def's Exs B-18 and C-19.) As for Lot 167, Defendant's comparables vary widely, selling for $165,000, $259,900, and $100,000, respectively. (Def's Ex A at 16). And, although Toledo states in her report that comparable #2 is given the most weight in valuing Lot 167, her adjusted sale price for that lot is $207,023 and her value estimate is $165,000. That number is

///

much closer to the adjusted sale prices of her other two comparables and precisely the amount comparable #1 sold for in August 2009. That lot was a foreclosure sale.

Toledo took exception with Voronaeff's sole reliance on foreclosure sales, arguing that such sales must be adjusted to reflect the atypical market conditions. Toledo applied a 40 percent foreclosure adjustment. That same adjustment would increase Voronaeff's purchase prices to $66,500 (lot 167), $44,100 (Lot 288), and $48,300 (Lot 57).

Toledo further argued at trial that prior decisions of this court preclude the use of post-assessment date sales unless (market or "time") adjustments are made. Toledo cited *Karge v. Clackamas County Assessor*, TC-MD 100167B, and *Chart Development v. Washington County Assessor*, TC-MD 000444C, citing *Ernst Bros.Corp. v. Dept. of Rev.*, 320 Or 294, 305, 882 P2d 591 (1994). On cross-examination, Toledo testified that the "time" trend for vacant land from January 2010 to January 2011 was three percent per month. Applying that trend to the adjusted purchase prices of Voronaeff's lots (using Toledo's 40 percent foreclosure adjustment), increases Voronaeff's prices to $74,850 (rounded) for Lot 167, $54,240 (rounded) for Lot 288, and $59,400 for Lot 57 (rounded). And, although Toledo made adjustments for differences in view, Voronaeff testified that two of the three lots (288 and 57) will lose their views when houses are built on nearby lots, and that the third lot (57) abuts the lesser quality neighborhood. Voronaeff further testified that Defendant's comparables are higher on the hill and have better views of the Mountains and golf course.

Under ORS 305.412, the court "has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." The subject properties are all vacant lots, each is within the same community, of the same size, adjacent to open space with varying degrees of "mountain views," and with access to

the same amenities and facilities. (Ptf's Ex 1 at 4, 11, and 15; Def's Ex A at 6, Ex B at 6, and C at 6.) Plaintiff testified that all three of the subject properties lacked the significant attributes such as superior view or access, which would need to be taken into account. Finding each property significantly similar to the other, and no justification by the Defendant for valuing the three subject properties so differently, the court finds that each lot shall be valued at $75,000 as of the assessment date.

### III.  CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that Plaintiff has demonstrated by a preponderance of the evidence that there is an error in the record assessments for all three properties for the 2010-11 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market values of all three of the subject properties (Accounts 17098, 17850 and 17234) was $75,000 as of the January 1, 2010 assessment date.

Dated this ___ day of April 2012.


DAN ROBINSON
MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on April 25, 2012. The Court filed and entered this document on April 25, 2012.*