DECISION
Plaintiff seeks reductions in the values, for the 2008-09 tax year, of 36 townhouse lots in a newly platted subdivision on the Oregon coast.[1] Plaintiff appealed Defendant's values to the county board of property tax appeals (BOPTA), and BOPTA sustained Defendant's values. Plaintiff timely appealed to this court seeking considerable reductions in the real market value (RMV), which, if granted, will reduce the maximum assessed value (MAV) and assessed value (AV) of the lots because the lots are newly created and were first placed on the rolls for the 2008-09 tax year.[2] Defendant requests that the court sustain the values currently on the rolls.
Trial in the matter was held by telephone. Plaintiff was represented by Greg Hoard (Hoard), Vice President of Finance and the managing member of Sahhali South. Testifying for Plaintiff were Brian L. Kelley (Kelley), MAI, from PGP Valuation, Inc.; designated appraiser and Oregon certified state appraiser, Tim Henton (Henton), President, Butterfield Homes, Inc.; and Dawn Barker (Barker), Realtor/Broker, CRS (Certified Residential Specialist), from Windermere Real Estate. Defendant was represented by Denise Vandecoevering *Page 2 
(Vandecoevering), Property Appraiser III and Sales Data Analyst, Tillamook County Assessor's office.
 I. STATEMENT OF FACTS
The lots under appeal are located in a subdivision known as Sahhali South. Plaintiff, a wholly owned subsidiary of Sycan B Corporation, was responsible for the development of the subdivision (e.g., platting, infrastructure, etc.). Plaintiff subdivided several larger parcels into 56 individual buildable lots, and added the infrastructure (paved roads with curbs and gutters, storm drains, underground utilities, and a special community sewage system). (Def's Ex 7 at 1.) The subdivision includes 10 "detached" single family residential lots on the east side of the development close to Highway 101, and 46-plus "attached" duplex style townhome lots on the other side of the development separated by 13 or more acres of protected open space, including a large wetland area. (See Ptf's Ex 5 at 21, 25.) The property is located on the west side of Highway 101 in the city of Neskowin, which is on the northern Oregon coast, approximately eight miles south of Pacific City and 13 miles north of Lincoln City. (Ptf's Ex 5 at 19.) The subdivision plat was recorded on February 16, 2007. (Def's Ex A at 1.)
The 36 lots at issue in this appeal are the vacant (i.e., undeveloped) "attached" duplex style townhouse lots. All of the lots have ocean views, although some are better than others. The lots range in size from approximately 4,000 square feet to 7,200 square feet. (Ptf's Ex 5 at 1.)
Plaintiff entered into an exclusive arrangement with Butterfield Homes (Butterfield) pursuant to which Butterfield obtained the right to purchase the lots over time at set prices agreed upon in 2006, and to construct duplex style townhomes for resale to interested parties as land/townhome packages. Each of the duplex townhomes is to be built on two lots, with one unit *Page 3 
on each lot. Under the parties' agreement, Plaintiff receives an additional commission from Butterfield upon the sale of the developed lots equal to two percent of the package sale price (lot and townhome). (Ptf's Ex 6 at 6.) As of the date of trial in late 2009, 12 townhomes had sold. (Def's Ex A at 1.) The prices of the completed townhomes (land and home) ranged from a low of $559,000 to a high of $927,773. (Ptf's Ex 7 at 2.) Plaintiff sold the unimproved lots to Butterfield for prices ranging from a low of $147,500 to a high of $176,800 between February 2007 and September 2008. (Ptf's Ex 7 at 1.) The bare lot sales are the same lots that later sold as completed townhomes. None of those properties are under appeal.
Owing to financial considerations, Butterfield delayed construction of the townhomes until two adjoining lots and townhomes were purchased. Thus, the first buyer of a lot would purchase the lot and select one of several townhome floorplan models, and Butterfield would then actively market the adjoining lot, holding off on construction until a second buyer (of the adjoining lot) was found. That arrangement often resulted in considerable delays between the time the buyer of the first lot contracted to purchase until the two unit (duplex) townhome was constructed and sold.
The appeal involves lots one through six, nine through 25, 30 through 33, 38 through 41, and 44 through 48 (for a total of 36 lots). (See Def's Ex A at 4.) The RMV on the rolls, and the parties' respective RMV estimates, are as follows:
Lot Nos. Roll Value Plaintiff's Value Defendant's Value
1 — 6 $220,000 $120,640 $220,000
9, 10 $220,000 $128,960 $220,000
11, 12 $220,000 $116,480 $220,000
13 $440,000 $200,000
14 $275,000 $112,320 $250,000
15 — 23 $275,000 $124,800 $250,000

Lot Nos. Roll Value Plaintiff's Value Defendant's Value
24, 25 $275,000 $135,200 $250,000
30 — 33, 38, 39 $350,000 $141,440 $350,000
40, 41 $275,000 $135,200 $250,000
44 — 47 $275,000 $122,720 $250,000
48 $700,000 $280,000

(Id.; Ptf's Compl at 2.)
Plaintiff's value estimates set forth above are a percentage (83.2%) of the May 2006 revised sale prices agreed to by Plaintiff and the builder Butterfield as part of the exclusive purchase option agreement between those parties. (See Ptf's Ex 6 at 13.) Defendant's estimates are derived from Vandecouvering's residual market value approach, which involved subtracting the value of the improvements from the sale price of townhome packages (land and home) in the subject subdivision and a nearby townhome subdivision. (Def's Ex A at 7.) As previously stated, Defendant requests that the values on the rolls be sustained, although her appraised values for 17 of the lots under appeal are slightly lower than the values on the rolls, and she did not value two other lots (13 and 48).
Each party submitted an appraisal report to support its opinion of value and request to the court. Plaintiff submitted a lengthy and detailed written appraisal report utilizing the comparable sales approach. (Ptf's Ex 5.) The appraiser (Kelley) concluded that a base lot value of $185,000 was appropriate for the 12 lots with "superior" views (lots 30-33, 38-41, 44-47), and that 12 lots with "average" views (lots 14-25) warranted a 10 percent negative adjustment ($18,500), resulting in a value estimate of $166,500, and that the 10 lots with "inferior" views (lots one-six, nine-12) required a 15 percent downward adjustment ($27,750), resulting in a value estimate of $157,250. (Ptf's Ex 5 at 53, 62.) Kelley valued the two remaining lots, 13 and 48, at $250,000 and $350,000 respectively. (Id. at 62.) *Page 5 
Defendant's appraiser Vandecoevering valued the lots using an approach she defines as the "land residual market approach." (Def's Ex A at 7.) Vandecoevering explains in her report that, under her approach, "* * * known components of value are accounted for, thus solving for the quantity that is left over, such as land residual[.]" (Id.) Vandecoevering determined the value of a completed townhome (land and home as a package, which is how the subject lots were marketed) based on the "Department of Revenue's 2005 cost factor book," adjusted for the "Tillamook County Local Cost Modifier." (Id.) As a final step, Vandecoevering subtracted the estimated value of the townhome plus on-site development costs from the "[s]ale price" to arrive at a residual value for the land. (Id.) Like Plaintiff's appraiser Kelley, the assessor's appraiser, Vandecoevering divided the lots into three categories based on view (fair, good, and very good), and arrived at estimated values of $217,488 for lots with a "fair" view (lots one-12), $268,102 for lots with a "good" view (lots 14-25, and 40-47), and $334,998 for lots with a "very good" view (lots 26-39). (Id. at 7, 8.) Notably, Vandecoevering's appraisal omitted lots 13 and 48. (See id.) Vandecoevering supplemented her value estimates with adjusted comparable sales data for the three categories of lots, and determined values of $239,000 ("fair" lots), $276,000 ("good" lots), and $352,229 ("very good"). (Id. at 10-12.)
 II. ANALYSIS
The issue in this case is the RMV of the subject property on January 1, 2008, which was the assessment date for the 2008-09 tax year. See generally ORS 308.007 (defining "[a]ssessment date" as "the day of the assessment year on which property is to be assessed under ORS 308.210 or 308.250," and the "[a]ssessment year" as a calendar year), *Page 6 
and ORS 308.210(1) (requiring the assessor to value all taxable property in the county "each year as of January 1, at 1:00 a.m. of the assessment year").[1]
 ORS 308.205(1) defines RMV as:
 "* * * the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."
The value of property is ultimately a question of fact. ChartDevelopment Corp. v. Dept. of Rev.,16 OTR 9, 11 (2001) (citation omitted). The party seeking affirmative relief has the burden of proof and, initially, the burden of going forward with the evidence. ORS 305.427. The burden of proof in the Tax Court is a "preponderance" of the evidence.Id. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. ofRevenue, 4 OTR 302, 312 (1971) (citation omitted). This court has previously noted that value is a range rather than an absolute.Price v. Dept. of Rev., 7 OTR 18, 25 (1977). Moreover, the legislature has given the court jurisdiction "to determine the real market value or correct valuation on the basis of the evidence before [it], without regard to the values pleaded by the parties." ORS 305.412.
The court generally looks for "arm's length sale transactions of property similar in size, quality, age and location" to the subject property in order to reach a correct RMV. Richardson v. ClackamasCounty Assessor, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003).
The parties present vastly different opinions on the value of the various lots under appeal. Such differences are not uncommon in tax court valuation appeals, and perhaps are to be expected. The parties agree that there was a general decline in the market in 2007, however, they agree on little else. *Page 7 
Plaintiff submitted two exhibits, backed by sworn testimony, specifically addressing the value of the subject property. Plaintiff submitted the appraisal by Kelley that was performed in November 2006, when the parties agree that the real estate market for coastal property was strong. (See Ptf's Ex 5 at 67.) As indicated above, Kelley concluded that a "base lot" with a superior view was estimated to be worth $185,000 at that time. (Id. at 62.) That estimate assumed an absorption rate of two lots per month (24 per year), based on historical data from several years prior to the appraisal date, which showed a rise in housing prices and sales volume, and a decrease in marketing time (i.e., days on the market before sale). (Id. at 44-45.) As it turned out, there were only 12 sales in the first 14 months, and no sales thereafter. (Def's Ex A at 1.) Kelley testified that there was a 50 percent drop in residential land sales on the central Oregon Coast from 2006 to 2007 (the assessment date in this case is January 1, 2008). Vandecoevering agreed that there was a 50 percent decline in bare land sales county-wide in 2007.
Kelley testified that land sale prices fell because potential home buyers wanted to pay less for homes, which resulted in builders demanding lower bare land sale prices so that they could keep the final home sale prices down. Kelley explained that builders had a difficult time getting reductions in the costs of materials and labor, which left land as the only place where the builder could reduce overall costs on a finished product (the home on the land).
Plaintiff's other specific value evidence is the agreement between Plaintiff and Butterfield for the sale price of the subject lots. (Ptf's Ex 6.) The parties initially agreed in February 2005, to a base lot price of between $130,000 (lots one-six) and $155,000 (lots 26-39), with prices for the other 24 lots under appeal falling between those two numbers. (Id. at 6.) Under that agreement, Plaintiff was to receive an additional two percent of the final improved *Page 8 
sale price of the lot with a home by Butterfield to a third party. (Id.) By way of example, the court calculates the commissions on the 12 reported sales to have ranged from $11,180 to $18,555.46. (Ptf's Ex 7 at 2, utilizing sales prices multiplied by two percent.) The parties subsequently agreed to reduced bare lot sale prices on May 30, 2006, although the reductions were nominal. (Ptf's Ex 6 at 13.)
Defendant disagrees with Plaintiff's assertion that the parties' agreed-upon purchase price for the bare lots represent arm's-length transactions because Plaintiff and the developer Butterfield had a close relationship and limited their market by presenting the land to prospective buyers as a package (requiring the purchase of a lot and the townhome from Butterfield), rather than Plaintiff marketing the lots directly to the public. That arrangement often resulted in considerable delays between the time the buyer of the first lot contracted to purchase until the two unit (duplex) townhome was constructed and sold. That, in turn, caused Butterfield to grant concessions (e.g., reduce the price of the adjoining lot) in order to complete a townhome project and get paid. While there may be some validity to that criticism, it fails to explain why Plaintiff would enter into an agreement that would generate less revenue than if it had made other arrangements for the sale of the lots. There is no evidence that Plaintiff or its individual members had any special relationship with Butterfield or its employees.
Henton, the President of Butterfield, who has 15 years of experience in the coastal building business, the last 10 of which focused on the area where the subject property is located, submitted a three-page written narrative to augment his sworn testimony. (Ptf's Ex 8 at 4-6.) A main point of Henton's testimony was that residential sales activity on the coast began to heat up in 2004, got very active in 2005 and 2006, and then began to cool off in 2007. (Id.) The significance of that testimony is that the vision, planning, and initial investment in the project *Page 9 
was based on an expectation of preliminary plat approval by late summer 2005, with the project moving forward smoothly and at an active pace from that point onward. (Id. at 4.) The parties expected that the infrastructure would be completed and they would receive final plat approval by the spring of 2006. (Id.)
Preliminary approval was received in September 2005, and Butterfield began accepting refundable deposits. (Id.) At that point interest was strong and, at one point, 23 of the 46 lots had been reserved. (Id.) The project then hit a "snag" when the Oregon Department of Transportation (ODOT) reversed an earlier decision and decided that it would not allow Plaintiff to create a protected left turn lane into the complex from Highway 101. (Id.) According to Henton's written narrative, "[t]his course reversal by ODOT resulted in months of delay and hundreds of thousands of dollars in additional expense to [Plaintiff]." (Id.) From "a sales standpoint," the difficulty created by the delay was the uncertainty of knowing when the issue would be resolved, thus leaving Butterfield unable to honestly predict when prospective buyers who had already placed refundable deposits to reserve a particular lot could expect the project to move forward. (Id. at 4-5.) Henton explained that, as the delay continued, the reservation list began to shrink and, by the time the final plat was recorded in February 2007, "the overall housing market had begun to cool from the fever pitch it had reached in 2004, 2005." (Ptf's Ex 8 at 5.) Henton stated that, in the end, "only [six] of the 23 parties that had reserved units followed through with the purchase." (Id.)
Henton testified that he took a considerable amount of time to find buyers and obtain approval to build, and that it was between 18 and 20 months before Butterfield received any revenue or profit. Henton also testified that he spent approximately $200,000 marketing the project. *Page 10 
Hoard, Plaintiff's Vice President of Finance and managing member, submitted additional exhibits that tended to buttress Plaintiff's claim that the market for townhome lots in the area of the subject lots was severely depressed in 2007 and continued to be in 2008. (See, e.g., Ptf's Ex 9 at 2, 8, showing that the majority of the lots in Phase I, platted in April 2006, sold quickly while only one lot in Phase II, which was platted in February 2008, had sold as of the date of trial; Ptf's Ex 10 at 1, 4, 6, showing that one lot which sold in June 2006 for $300,000 was back on the market in March 2008 for $295,000, subsequently reduced to a short sale price of $189,900, then foreclosed by the lender and listed for $170,000).
Hoard presented testimony on the poor state of the real estate market on the coast through the testimony of Barker, an experienced Oregon coastal realtor and broker with additional qualifications of certified residential specialist (CRS) and certified home market specialist (CHMS). Barker testified that she has worked in the Oregon coast region for the past 20 years and has concentrated on the Neskowin area, which is roughly two to three miles south of the subject property. Barker testified that the market was very active between 2004 and 2006, with a slight "slow down" at the end of 2006 and that the market "definitely slowed" in 2007. Barker testified that the sales of bare land dropped off and that it was cheaper to buy an existing home than to buy land and build because there were "good deals" on existing homes. Barker testified she was familiar with Sahhali Shores (the subject development), where she has listings, and that she conducted a market study of the area. Barker also marketed lots at Pelican Point, a nearby subdivision, and suggested that the owner reduced price was approximately $100,000 "halfway through 2007."
By comparison, Defendant submitted very little evidence regarding the value of the property, and Vandecoevering's sworn testimony at trial focused primarily on a critique of *Page 11 
Plaintiff's evidence. Hoard presented a persuasive critique of various aspects of Defendant's case, most notably opining that Defendant selected sales that tended to support the county's higher values and that Vandecoevering was overly influenced by Plaintiff's marketing brochure which was put out in August 2008 with the hopes of generating renewed interest in the subject property. The court reviewed the advertisement (Def's Ex A at 3) and, notwithstanding the flowery language, the brochure is typical of the puffing used by salesman.
 III. CONCLUSION
On balance, the court finds Plaintiff to have presented a more persuasive picture of the overall condition of the real estate market on the coast as of January 1, 2008, and the range of values for the subject property. Accordingly, the court concludes that the RMV of the subject property for tax year 2008-09 should be reduced to the values requested by Plaintiff. Specifically, lots one through six had an RMV as of January 1, 2008, of $121,000 (rounded), lots nine and 10 had an RMV of $129,000, lots 11 and 12 had an RMV of $116,500, lot 13 had an RMV of $200,000, lot 14 had an RMV of $112,500, lots 15 through 23 had an RMV of $125,000, lots 24 and 25 had an RMV of $135,000, lots 30 through 33, 38 and 39 had an RMV of $141,500, lots 40 and 41 had an RMV of $135,000, lots 44 through 47 had an RMV of $123,000, and Lot 48 had an RMV of $280,000.
IT IS THE DECISION OF THIS COURT that Plaintiff's appeal for a reduction in the RMV of the subject property as of January 1, 2008, involving 36 lots, is granted as set forth above; and *Page 12 
IT IS FURTHER DECIDED that the stipulated values of the eight remaining lots, embodied in the court's Order filed October 15, 2009, are incorporated into this Decision.
Dated this ___ day of December 2010.
If you want to appeal this Decision, file a Complaint in theRegular Division of the Oregon Tax Court, by mailing to:1163 State Street, Salem, OR 97301-2563; or by hand delivery to:Fourth Floor, 1241 State Street, Salem, OR.
 Your Complaint must be submitted within 60 days after the dateof the Decision or this Decision becomes final and cannot bechanged.
 This document was signed by Magistrate Dan Robinsonon December 30, 2010. The Court filed and entered this documenton December 30, 2010.
[1] Plaintiff appealed 44 accounts total, eight of which were stipulated to.
[2] Defendant's representative, Vandecoevering, states in her appraisal that the change property ratio (CPR) applied to RMV to arrive at an AV was 0.481 for the year at issue. (Def's Ex A at 7.) That ratio is applied to the RMV to arrive at MAV and AV, the latter of which is generally used in computing and levying property taxes. As such, every dollar reduction in RMV will reduce AV by roughly 52 cents.
[1] All references to the Oregon Revised Statutes (ORS) are to 2007.