DECISION
Plaintiff has appealed the value of its real property in McMinnville for the 2008-09 tax year. The property is identified as Account 128659.
Trial in the matter was held in the courtroom of the Oregon Tax Court December 16, 2009. Plaintiff was represented by John Niemeyer (Niemeyer), the owner of Oregon Wine Services. Niemeyer, who described himself as a known "junk property dealer" with 50 years of banking and real estate experience, testified at trial. Also testifying for Plaintiff were Dirk Otis (Otis), a developer who works for Niemeyer (but is not employed by Plaintiff) as his Business Manager, and Jeff Meader (Meader), General Manager and co-owner of Oregon Wine Services. Defendant was represented by Brian Linke (Linke) and Jeff Ivie (Ivie), both of whom are commercial/industrial appraisers with the assessor's office.
 I. STATEMENT OF FACTS
The subject property is a large building on a 12.75 acre lot in the McMinnville, Oregon, which Plaintiff views as a food processing and manufacturing facility and Defendant characterizes as an industrial warehouse. (Ptf s Compl at 4; Def s Ex A at 4.) The property was originally developed in 1964 as a bakery for the Pillsbury Company. (Def s Ex A at 4.) The *Page 2 
building was expanded in the 1970's to approximately 100,000 square feet. (Id.) Subsequent additions increased the footprint to approximately 108,000 square feet.[1] (Id.)
Niemeyer, a local real-estate investor, purchased the building in 2001 for $1,200,000. (Id.) The building stood vacant for approximately nine months after the purchase. (Id.) There is some disagreement about Niemeyer's intentions for the use of the property at the time of acquisition. Niemeyer testified that he purchased the property with the intention of fixing it up a little and renting it out. According to information on Plaintiff's website, which Defendant introduced into evidence, Niemeyer's intention all along was to open a wine storage facility. (Def's Ex B-1.) The relevant language from Plaintiff's website states that Niemeyer purchased the building "with the idea of opening a wine storage facility." (Id.) That exhibit further states that the building was closed for the first nine months while renovations were made to "the cooling system, insulated rooms and offices." (Id.)
The property began operating as a wine storage facility in the latter part of 2002 under the name of Oregon Wine Services. (Id.) Transportation and storage appear to have been the primary functions initially. (Id.) In 2003, Oregon Wine Services formed a partnership with an individual named Laurent Montalieu (Montalieu) "to create a custom crush facility called NW Wine Company." (Id.) Defendant asserted, and Plaintiff did not dispute, that Niemeyer (or Oregon Wine Services) and Montalieu are equal partners in the NW Wine Company partnership. NW Wine Company rents slightly less than one-half (approximately 45 percent) of the facility *Page 3 
for its winemaking business. (Ptf's Ex 3.[2]) The reported gross rent for 2007 paid by NW Wine Company to Oregon Wine Services was $223,110. (Id.) The parties' relationship bears on the question of whether the annual negotiated rents paid by NW Wine Company are arm's-length and therefore representative of the market, as explained more fully in the analysis below.
Currently, as well as on the applicable assessment date, two separate businesses operate out of the building: Oregon Wine Services and NW Wine Company. Oregon Wine Services provides grape and wine storage and shipping, while NW Wine Company is a custom crush business described by Plaintiff as a "custom wine growing facility" which facilitates all aspects viticulture (grape cultivation) and winemaking processes. (Def's Ex C-1, C-2.) According to literature, NW Wine Company "works with vineyard owners ranging from 1 acre to 200 acres in the Willamette Valley, Oregon and beyond." (Def's Ex C-2.) Montalieu, the founder of NW Wine Company, also produces wine under his own label. (Def's Ex C-1.)
Defendant describes the building as a "concrete tilt-up with some brick façade on [the] office portion of the structure, and some metal siding on the rear portion of the structure." (Def's Ex A at 11.) The office area contains five offices, a conference room, a server room, and a storage closet. (Id.) There are separate locker rooms for men and women, each of which includes sinks, toilets, and numerous lockers (there are 78 metal lockers in the men's locker room). (Id.) There is also a break room utilized as a reception area. (Id. at 12.)
The majority of the building consists of production, packing, and storage areas (both dry storage and cooled). (See Def's Ex A at 11-18.) There are approximately 30 separate rooms in the facility with varying ceiling heights. (Id.) The interior walls that separate the rooms are concrete tilt-up, concrete block, or some type of metal framing, which makes it more difficult *Page 4 
and expensive to remove any interior walls to combine several smaller rooms into a single larger room. (Id.) Exterior amenities include a chain link fence, a concrete courtyard, additional concrete pads, and asphalt paving on all sides of the building, including a parking area and a loading dock. (Def's Ex A at 18.)
The property is currently on the tax rolls with a real market value (RMV) as of January 1, 2008 (2008-09 tax year) of $3,624,530. The land carries a value (RMV) of the $1,455,017 while the building is valued at $2,169,513 ($20 per square foot rounded). The assessed value is also $3,624,530 (because RMV is less than maximum assessed value, known as MAV). Those were the values placed on the property by the county assessor and affirmed by the county board of property tax appeals.
Plaintiff appealed the values to this court, requesting an RMV of between $1,800,000 and $2 million. Defendant requested both in its Answer and at trial that the court sustain the current roll value of $3,624,530, although Defendant appraised the property for appeal purposes and concluded with a RMV of $4,900,000. (Def's Ex A at 43.)
 II. ANALYSIS
RMV for purposes of ad valorem taxation is defined by statute as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).[3] The assessment date for the 2008-09 tax year was January 1, 2008. See generally ORS 308.007.
The Department of Revenue (department) has promulgated an administrative rule instructing that the determination of RMV should be based on consideration of the three standard *Page 5 
approaches to value — sales comparison approach, cost approach, and income approach. OAR 150-308.205-(A)(2)(a).[4]
Defendant utilized all three approaches in valuing Plaintiffs property. (Def s Ex A.) Plaintiffs documentary evidence submitted prior to trial in accordance with court rules addresses only the income and sales comparison approaches to value, although Plaintiffs trial witnesses, all of whom were knowledgeable and experienced, presented valuation testimony on all three approaches.
A. Plaintiff's Value Evidence
Plaintiff presented a variety of value estimates under the income capitalization approach to value. Using the subject's actual rent of $.15 per square foot for the portion of the building Plaintiff leases to NW Wine Company, and deducting various expenses, Plaintiff arrived at a net operating income (NOI) of $85,000 (rounded). (Ptf s Exs 3, 3A, and 3B.) Niemeyer testified at trial that capping that $85,000 NOI at eight percent resulted in a value of $1,062,500, and at nine percent, generated a value of $944,444. That figure, however, is based only on the percentage of the property rented to NW Wine Company, which Plaintiff originally estimated to amount to 45.5 percent of the total. (Ptf s Ex 3.) Assuming the validity of the income information and its applicability to the entire property, the indicated value for the entire property would be between $2,335,165 ($1,062,500 ÷ .455) and $2,075,701 ($944,444 ÷ .455). Niemeyer presented slightly higher value estimates at trial of $2,566,000 and $2,424,000 based on a net rent of $.20 per square foot and cap rates of 8.5 percent and 9 percent. (Ptf s Ex 3B.) Otis, one of Niemeyer's witnesses, testified that the value of the property under the income approach was approximately $2,900,000 using a "blended" income rate and a cap rate of 8.5 percent. Those figures are *Page 6 
considerably higher than Plaintiff's requested value of between $1.8 million and $2 million, although they are still more than $600,000 below the current total RMV of $3,624,530.
Plaintiff estimates the value under the sales comparison approach to be between a low of $2,108,000 and a high at $2,300,000. Plaintiff's Exhibit 4-1 presents six comparable properties in Oregon and Washington with an average sale or list price of $21.60 per square foot, for an indicated value of $2,272,333. At trial, Niemeyer testified that the value of the property should be based on $20 per square foot, which generates an estimated value of $2,108,000 using Plaintiff's building size of 105,400 square feet, and $2,159,140 using Defendant's building size of 107,957 square feet. Finally, Otis testified that the property had a value of $2,300,000 at $22 per square foot.
Turning to the cost approach, which is based on a theory of substitution, Otis testified that the property had a value of $2,020,263 using $40 per square foot as the replacement cost new for the building, and adjusting that figure by 40 percent for physical depreciation and by 40 percent for functional obsolescence, to arrive at a building RMV of $1,024,263. Otis's land RMV is $996,000 (rounded) based on a value of $2 per square foot for 11.43 acres, which excludes an alleged wetland area of 1.32 acres. Defendant disputes the wetlands claim, arguing that there is no public record of any designated wetlands on the property. Plaintiff did not present any evidence to support its claim or refute Defendant's challenge. Linke further testified that there are areas in McMinnville that have had a past history of "wetlands" problems that have, over time, "gone away."
B. Defendant's Value Evidence
As indicated above, Defendant submitted an appraisal report that presented value estimates for the subject property using the three standard approaches to value. Defendant valued the subject under the income capitalization approach using a triple net lease rent of $.28 *Page 7 
per square foot per month to arrive at a yearly NOI of $362,724. (Def s Ex A at 41.) Defendant applied a capitalization rate of 8 percent, to arrive at an estimated value of $4,534,050, plus $792,792 for the land it considers to be "excess," to arrive at a total RMV of $5,326,842. (Def s Ex A at 41-42.) Defendant's value estimate under the sales comparison approach is $4,642,151 using a per square foot value of $43. (Id. at 39.) Defendant's per square foot value estimate is based on five comparable sales. (Id. at 37-39.) Again, Defendant adds $792,792 for "excess land," to arrive at a total RMV under the sales comparison approach of $5,434,943. (Id. at 40.) Finally, Defendant estimated value of the subject under the cost approach at $4,474,241. (Id. at 33.) In arriving at that number, Defendant used four comparable land sales in valuing the land and "Marshall Valuation Services' computerized Commercial Cost Estimator" to value the building. (Id. at 24-26, 27-28.) Defendant's cost value estimate is based on a replacement cost new of $43.13, plus 10 percent for entrepreneurial profit, for a total replacement cost new of $5,121,314, less deductions of 33 percent for physical depreciation and 10 percent for functional obsolescence, generating a total improvement RMV of $2,919,149. (Id. at 28-29, 31-33.) Defendant adds $1,555,092 for the combined the land RMV, dividing the property into two portions; the developed portion in around the building and the undeveloped land deemed "excess land." (Id. at 24-26, 33.) Defendant gave equal weight to all three approaches and came up with a reconciled value of $4,900,000, allocating $1,555,092 to the land and $3,344,908 to the improvements. (Id . at 43.)
C. Court's Evaluation and Analysis
This court has previously noted that value is a range rather than an absolute. Price v. Dept. of Rev., 7 OTR 18, 25 (1977). Informed buyers consider a number of factors relevant in an arm's-length transaction including size, location, year of construction, and condition of the premises. *Page 8 
The burden of proof in the Tax Court is a "preponderance" of the evidence and falls upon "the party seeking affirmative relief" which, in this case, is Plaintiff. ORS 305.427. The Oregon Supreme Court has stated that:
 "`Preponderance' derives from the Latin word `praeponderare,' which translates to `outweigh, be of greater weight.' 8 Oxford English Dictionary 1289 (1933). With regard to the burden of proof or persuasion in civil actions, it is generally accepted to mean the greater weight of evidence."
Riley Hill General Contractor v. Tandy Corp., 303 Or 390, 394, 737 P2d 595
(1987). This court has previously ruled that "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." Feves v. Dept. of Revenue, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." Reed v. Dept. of Rev., 310 Or 260, 265,798 P2d 235 (1990).
Plaintiff's appeal seems to have been prompted, at least in part, by the significant increase in RMV over the prior tax year (2007-08), which was only $1,887,867. (Ptf's Compl at 3.) Defendant explained that the significant increase in RMV for the 2008-09 tax year over the prior year was based on the fact that the property's value was reduced significantly in a prior year appeal and that under ORS 309.115, that adjudicated value limited the county's ability to increase the subject's RMV to keep pace with the rising market, and that once the five-year statutory freeze on value increases imposed by ORS 309.115 expired, the county revalued the property based on market data. The court finds that explanation reasonable, given that the whole reason the legislature passed ORS 309.115 was to prevent taxpayers from having to appeal their value each year after successfully achieving a reduction in value. While that statute certainly achieves its intended purpose, it can, particularly in an active market, result in a sudden, significant increase in value once the five-year period expires.
After reviewing Plaintiff's exhibits and listening to the testimony of Plaintiff's trial witnesses, the court is unclear as to Plaintiff's proof of value. Plaintiff stressed the poor *Page 9 
condition of the building, suffering from both physical and functional obsolescence due to its age, poor condition (described as "worn-out"), and bad layout (approximately 30 rooms with varying ceiling heights). Plaintiff also stressed that the monthly net rental income stream was only $.15 to $.20 per square foot as opposed to Defendant's $.28 per square foot, and complained that Defendant inappropriately used urban comparables to value Plaintiffs rural property located in McMinnville. The court would find that last point more persuasive if Plaintiff had not itself relied on properties as far away as Medford and Salem, Oregon in its rent study and included those same sales plus two additional properties even farther away, one in more rural Yakima and another in Grandview, Washington. (Ptf s Ex 4-1.)
Due to the age of the building, the court finds the cost approach to be of little or no relevance. Both parties felt it necessary to make considerable adjustments for depreciation and obsolescence, and the magnitude of those adjustments buttresses the court's rejection of that approach. That leaves the sales comparison approach and the income approach.
Of the three value approaches presented by Plaintiff, its income approach was the most detailed. However, the court views Plaintiffs income valuation evidence with some caution because it is based on the rent Plaintiff charges NW Wine Company, and Plaintiff has an ownership interest in NW Wine Company. As such, the lease agreement may not have been arm's-length and the resulting rent charged may not reflect the actual potential market rent for the space leased, which is just under half the building. Admittedly, Plaintiff presented modified proposed values under the income approach at trial, using greater market rents and various capitalization rates, although Plaintiffs higher rent of $.20 per square foot is still roughly 30 percent lower than Defendant's $.28 per square foot market rent. Defendant relied on rental income from six properties it deemed comparable in arriving at its figure. (Def s Ex A at 41.) The court finds Defendant's data more reliable and persuasive. *Page 10 
As for Plaintiffs comparable sales approach, Plaintiff estimated the value to be between $2,108,000 and $2,300,000, while Defendant's value is considerably higher at $4,642,151. Again, the court finds little support for Plaintiffs comparable sales valuation. Plaintiff presented testimony from a number of well-qualified individuals and they may well be correct in their estimate of the value of the subject. However, there was insufficient explanation for the witnesses' conclusions and the data presented at trial was conclusory in nature. Niemeyer testified that he relied on "seven sales" and Otis simply asserted that the property would sell for $22 per square foot. It is one thing to be right; another to prove it. Plaintiff failed to adequately substantiate its experts' conclusions. Plaintiffs documentary evidence set forth in its Exhibit 4 relies on six comparable sales, but Plaintiff simply averaged reported sales prices (on a per foot basis) in valuing the subject. Defendant presented a more detailed and thoughtful analysis, with a written narrative explaining the appraiser's thought process. (See generally Def s Ex A.)
Finally, while Plaintiff presents a rather bleak assessment of the property for purposes of its quest for a value reduction from the Tax Court, Plaintiffs actions with regard to the property suggest a different picture. At the time of the January 1, 2008, assessment date Plaintiff was in the middle of the considerable expansion of the subject property, adding approximately 61,000 square feet of temperature controlled storage. (Def s Ex B-1.) Those actions imply that Plaintiff had a more optimistic outlook for the property than presented at trial.
In the end, the court finds that Plaintiff has failed to establish an error in the record assessment by a preponderance of the evidence. Accordingly, the values on the rolls are sustained. *Page 11 
 III. CONCLUSION
After a lengthy, thoughtful, and detailed review and analysis of the evidence before it, the court concludes that Plaintiff has failed to prove that the values on the rolls for the 2008-09 tax year are in error. Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs appeal is denied and the real market value for the subject property as of January 1, 2008, is as currently set forth on the rolls. That value is $3,624,530, with the allocation between land and improvements being $1,455,017 for the land and $2,169,513 for the improvements.
Dated this ___ day of January 2011.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date ofthe Decision or this Decision becomes final and cannot be changed.
 This document was signed by Magistrate Dan Robinson on January 13,2011. The Court filed and entered this document on January 13, 2011.
[1] The parties disagree on the size of the building. Plaintiff insisted at trial that an exterior survey shows the building to be 110,000 square feet in size, but that 4600 square feet were "taken off" the building in 2007. Defendant's appraiser Linke testified that he measured the building during an inspection of the property lasting seven and one half hours and came up with a figure of 107,957 square feet. The difference may be due to the fact that the property was apparently under renovation in 2007 and 2008. Plaintiff added an additional "61,000 square feet of on-site temperature controlled storage area," but according to the evidence, construction was not completed until July 2008. (Def's Ex B-1.) That expansion brought the total size of the facility to slightly more than 170,000 square feet, but, because construction was not completed until after the January 1, 2008, assessment date, the additional square footage is not taken into account in valuing the property for the 2008-09 tax year. The court concludes that the size of the building was 108,000 square feet on January 1, 2008.
[2] Using the court's 108,000 square foot conclusion (see fn 1) and Plaintiff's estimate of the area NW Wine Company occupies (47,850 sq ft).
[3] All references to the Oregon Revised Statutes (ORS) are to 2007.
[4] References to the Department's Oregon Administrative Rules (OAR) are to those in effect in 2008. *Page 1