IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| LOWES HIW INC, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 220188R |
| | ) | |
| v. | ) | |
| | ) | |
| YAMHILL COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the 2020–21 and 2021–22 real market values of a big-box home improvement store identified by Defendant as Account Number 171860. The two cases were tried together and present similar issues. The former year is appealed in TC–MD 210217G; the latter in TC–MD 220188R. For the convenience of the reader, the decisions in both cases are identical up until the conclusion.

At trial, Plaintiff was represented by Benjamin Blair of Faegre Drinker Biddle & Reath LLP, and Defendant was represented by Jodi Gollehon of the Yamhill County Counsel's Office. Jeff Buono, MAI, testified for Plaintiff. Testifying for Defendant were John Hockman, registered appraiser, and Defendant himself—Derrick Wharff. Plaintiff's Exhibits 1 to 4 and Defendant's Exhibits A to F were admitted.

I. STATEMENT OF FACTS

The subject is an approximately 135,000-square-foot big box on an 11.91-acre lot with about 565 parking spaces, housing Plaintiff's retail store in McMinnville.[1] (Exs 1 at 5, 27; A at 8, 26.) It was built in 2004 and has never been transferred; the improvements were designed for

---

[1] Mr. Buono reports the building size as 134,574 square feet with 569 parking spaces, and Mr. Hockman reports it as 135,220 square feet with 562 parking spaces; the differences are immaterial.

their existing use. (Exs 1 at 27–28; A at 8, 39.) Both parties' appraisers state that the subject's existing use was its highest and best use during the relevant years. (Exs 1 at 35; 2 at 43; A at 51; B at 51.)

A.   *Plaintiff's Appraisals*

Mr. Buono prepared two appraisal reports that he described as "extremely similar," one appraising the subject as of January 1, 2020, and the other as of January 1, 2021. (Exs 1 at 6; 2 at 7.) In each report, Mr. Buono developed the income approach and the sales approach. (*Id.*) He concluded that developing the cost approach was unwarranted because of the improvements' age and because market data to support an estimate of accrued depreciation was lacking. (Ex 1 at 36; Ex 2 at 44.)

Mr. Buono appraised the property rights constituting what he termed the subject's "fee simple interest." (Exs 1 at 12; 2 at 13.) He defined "fee simple estate" as follows:

> "Absolute ownership unencumbered by any other interest or estate, subject only to limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat."

(*Id.* (citing *The Dictionary of Real Estate Appraisal*, Sixth Edition, Appraisal Institute, Chicago, Illinois, 2015).)

1.   *Plaintiff's 2020–21 and 2021–22 sales approaches*

Mr. Buono selected six comparable sales for his 2020–21 appraisal, located throughout Oregon and Washington: two former Big Ks, two former Costcos, a former Lowe's, and a vacant Sears. (Ex 1 at 49.) Mr. Buono selected five of those six comparables again for his 2021–22 appraisal, substituting a former Fabric Depot for one of the former Costcos. (Ex 2 at 57.) All of Mr. Buono's comparable sales for both years transferred what he terms "fee simple" rights. (*Id.*; Ex 1 at 49.) In other words, they were unencumbered by any lessee's interest—vacant.

Mr. Buono applied a three-percent-per-annum upward time trend (his "market conditions" adjustment) to both years' comparables. (Exs 1 at 48; 2 at 56.) He discontinued that adjustment on the 2021–22 appraisal after March 15, 2020, and included a five-percent downward adjustment to all comparables for "COVID-19 market impact." (Ex 2 at 56.) For both years, he made qualitative adjustments for location, size, quality, condition, exposure, and parking ratio. (Exs 1 at 52; 2 at 60.) Mr. Buono's adjusted values did not greatly differ from his comparables' unadjusted values, and ranged from $49 to $98 per square foot for 2020–21 and $47 to $93 per square foot for 2021–22, with an average value of $72 to $73 per square foot. (*Id*.)

Mr. Buono determined that the vacant Sears store was the best indicator for both years and concluded to a value of $9,420,000 ($70 per square foot, rounded) for 2020–21 and $8,750,000 ($65 per square foot, rounded) for 2021–22. (Exs 1 at 53; 2 at 61.)

2.      *Plaintiff's 2020–21 and 2021–22 income approaches*

Mr. Buono's income approaches were guided by his view that, if the subject were to be rented out, it would first need to be divided into at least two rental spaces because "[t]here is an extremely limited pool of potential tenants for the subject property due to its overall size." (Exs 1 at 46; 2 at 55.) That view led him to seek comparable leased spaces half the subject's size and to apply a $6,730,000 downward adjustment for "lease TI costs" to his direct capitalization conclusions. (Exs 1 at 46–47; 2 at 54–55.)

Mr. Buono used the same six lease comparables for both years, with net rentable areas ranging from 34,389 to 106,238 square feet and averaging 76,006 square feet. (Exs 1 at 41; 2 at 46.) Mr. Buono applied a time trend to the leases, but made no other quantitative adjustments because he considered such adjustments too speculative given the size difference between the

subject and the comparables. In lieu of adjustments to his comparables' rents, Mr. Buono applied the "lease TI costs" adjustment to his indicated value, discussed below. Mr. Buono determined that adjusted rents for the subject were $9.50 per square foot for 2020–21 and $9.75 per square foot for 2021–22. (Exs 1 at 41–42; 2 at 49–50.)

Mr. Buono derived total operating expenses and capitalization rates for both years primarily by analyzing comparables, also giving some attention to capitalization rate surveys and a hypothetical band of investment calculation. (Exs 1 at 42–45; 2 at of 50–54.) He concluded to capitalization rates of 7.25 percent and 7.50 percent for each year, respectively. (*Id*.) After deducting operating expenses and vacancy and credit loss, then adding back reimbursements for a triple net lease, Mr. Buono's "indicated value" for the subject under the income approach was $15,860,000 for 2020–21 and $15,770,000 for 2021–22. (Exs 1 at 46; 2 at 54.)

The phrase "indicated value" is placed in quotation marks above because the two values in question are not Mr. Buono's concluded values under the income approach. After reaching his indicated value for each year, Mr. Buono applied a $50-per-square-foot downward "lease TI costs" adjustment representing the "cost to demise the property to a minimum of two tenants." (Exs 1 at 46; 2 at 55.) The numerical data from which that adjustment is derived is not included in the appraisal report. The adjustment was based on interviews with two brokers who had relevant experience and on Mr. Buono's knowledge of "costs for demising of similar properties." (*Id*.) Mr. Buono therefore deducted $6,730,000 from his indicated values for each year, concluding to values of $9,130,000 for 2020–21 and $9,040,000 for 2021–22. (Exs 1 at 47; 2 at 55.)

/ / /

/ / /

3.      *Plaintiff's reconciliation of value conclusions*

Mr. Buono's concluded values under the sales comparison and income approaches for each year were quite close.  (Exs 1 at 54; 2 at 62.)  Although he considered the data supporting both approaches to be good, he placed primary weight on his sales comparison approach.  (*Id*.)  His final value conclusions were the same as his sales comparison approach conclusions: $9,420,000 for 2020–21 and $8,750,000 for 2021–22.  (*Id*.)

B.      *Defendant's Appraisals*

Mr. Hockman prepared an appraisal report for each year.  (Exs A, B.)  In preparing his reports, Mr. Hockman adopted a hypothetical condition as follows:

> "In an attempt to follow the recommendations of the IAAO guide to market-based valuation of commercial big-box retail (September 2017) and the State of Oregon Department of Revenue, the subject property has been appraised under the hypothetical condition that it was 100% occupied by a single tenant with a market-oriented, long-term lease (say 10 years) as of the effective date."

(Exs A at 14; B at 14.)  Mr. Hockman wrote that the condition of the subject being a stabilized rental property was "contrary to what exists" and its adoption as a hypothetical "might have affected the opinions and conclusions" of his appraisals.  (*Id*.)  Each of Mr. Hockman's reports developed the cost, income, and sales comparison approaches to value.  (Exs A at 51; B at 51.)

1.      *Defendant's 2020–21 and 2021–22 cost approaches*

Mr. Hockman wrote that he developed the cost approach for each year because it is an approach "typically used for *ad valorem* tax purposes."  (Exs A at 85; B at 86.)  His reports state that he gave the cost approach secondary weight because the subject's age made estimating depreciation difficult.  (*Id*.)  In his testimony, he stated that he gave the cost approach "no weight."

/ / /

In each of his cost approaches, Mr. Hockman derived the land value from local sales comparables and the improvement value of a "warehouse discount store" from the Marshall & Swift Valuation Service. (Exs A at 51–61; B at 51–61.) Following tables provided by Marshall & Swift, Mr. Hockman applied multipliers for building size and location, then deducted approximately one third of the result in estimated depreciation based on the subject's age. (*Id*. at 60.) His conclusions were a real market value of $15,330,000 for 2020–21 and $15,410,000 for 2021–22. (*Id*. at 61.)

2. *Defendant's 2020–21 and 2021–22 sales comparison approaches*

Mr. Hockman identified five sales comparables applicable to both years, each of which sold with a lease in place. (Exs A at 75–85; B at 76–86.) The buildings were occupied by big-box retailers: Home Depot, Lowe's, McClendon Hardware, and two At Home stores. (Exs A at 76–77; B at 77–88.) Mr. Hockman applied a time trend for market conditions and various qualitative adjustments, reaching adjusted sales prices ranging from $98.36 to $121.01 per square foot for 2020–21, and from $101.31 to $125.71 for 2021–22. (*Id*.) He gave most weight to the June 2020 sale of the Home Depot in Salem. (Exs A at 84; B at 85.) He concluded to real market values of $112 and $114 per square foot for each year, which amounted to $15,140,000 for 2020–21 and $15,420,000 for 2021–22.

3. *Defendant's 2020–21 and 2021–22 income approaches*

Mr. Hockman used the same five lease comparables for both years, with leased areas ranging from 60,673 to 116,973 square feet and averaging 88,618 square feet. (Exs A at 64–65; B at 64–65.) Four of the rented spaces were complete buildings; the other was a portion of a building slightly larger than the subject. (*Id*.) Mr. Hockman made downward adjustments for size ranging from one to seven percent, based on the subject's full size of 135,220 square feet.

(*Id.*) He also applied a time trend and adjustments for condition, age, parking, and location. (*Id.*) Mr. Hockman determined that adjusted monthly rents for the subject were $0.67 per square foot for 2020–21 and $0.68 per square foot for 2021–22. (Exs A at 70; B at 70.) On an annual basis, those rents are $8.04 and $8.16 per square foot, respectively.

In choosing a capitalization rate, Mr. Hockman analyzed national data and regional sales, including all his sales comparables. (Exs A at 72–73; B at 72–74.) The regional sales' range of 5.81 to 8.01 percent was supported by the national data, and he chose a capitalization rate of 6.25 percent for both years. After deducting for operating expenses (derived from unspecified "industry standards and published sources") and for vacancy and credit loss, then adding in reimbursements for a triple net lease, Mr. Hockman's indicated market values were $15,240,000 for 2020–21 and $15,470,000 for 2021–22. (Exs A at 74; B at 75.)

4. *Defendant's reconciliation of value conclusions*

The results reached by Mr. Hockman for each of his three approaches were quite similar, varying by less than half a percent. (Exs A at 85; B at 86.) He considered the cost approach less reliable because of the difficulty in estimating depreciation and gave primary weight to both his income and sales comparison approaches. (*Id.*) His final value conclusions were $15,200,000 for 2020–21 and $15,440,000 for 2021–22.

Mr. Hockman's final value conclusions reflect the subject's value "as stabilized," in accordance with the hypothetical condition he adopted. (Exs A at 85; B at 86.) He stated that, to reach a value "as is" without the hypothetical condition, a deduction would be required for "[c]osts associated with achieving stabilized occupancy [which] typically include tenant improvements, rent loss during an absorption period, leasing commissions and entrepreneurial profit." (Exs A at 131; B at 132.)

C.      *Parties' Requested Real Market Values*

Although Mr. Hockman's "as stabilized" value for 2020–21 is significantly higher than the value on the tax roll, Defendant does not seek to increase the real market value. Defendant asks the court to sustain the roll values of $12,935,058 for 2020–21 and $15,989,084 for 2021–22. Plaintiff asks the court to reduce the roll values to $9,420,000 for 2020–21 and $8,750,000 for 2021–22.

## II.  ANALYSIS

At issue are the real market values of the subject for the 2020–21 and 2021–22 tax years. Because Plaintiff is the only party seeking a court order changing the values on the rolls, it must bear the burden of proof. *See* ORS 305.427.[2]

Plaintiff requests real market values equal to the conclusions of Mr. Buono's appraisals, which rely primarily on the sales comparison approach. Mr. Buono and Mr. Hockman differ significantly in their choice of comparable sales for the subject. Mr. Buono relies exclusively on sales of vacant buildings, whereas Mr. Hockman relies on sales of leased, occupied buildings. The difference in choice of comparables reflects a deeper difference over the nature of the interest being appraised and the scope of the subject's highest and best use.

A.      *Property Interest Valued*

The stated purpose of Mr. Buono's appraisals is to develop an opinion of the value of the subject's "fee simple estate" as that term is defined in *The Dictionary of Real Estate Appraisal*: "Absolute ownership unencumbered by any other interest or estate, subject only to limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat." Under that definition, the term *fee simple* applies only when property is unencumbered by any

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2019.

other interest—including a leasehold. Because a lease is an encumbrance on a property, the "fee simple estate" (as understood by appraisers) vanishes when a lease is signed.[3] That sort of "fee simple" interest is only transferred when a vacant property is sold, which is why Mr. Buono chose sales of vacant big-box stores as comparables.

However, what appraisers term the "fee simple estate" is not necessarily the proper object of valuation for *ad valorem* taxation. *Albertsons Companies v. Clackamas County Assessor*, TC–MD 210135G, 2023 WL 8889855 at *5–*7 (Or Tax M Div Dec 22, 2023) (discussing difference between appraisers' and lawyers' use of term *fee simple*) (*Albertsons*). A property's value for tax assessment includes the value of all interests in the property, including lessees' interests. *See Powell Street I, LLC v. Multnomah County Assessor*, 365 Or 245, 445 P3d 297 (2019) (tax assessed on "the value of all interests in the property, including those of the owner (ordinarily the lessor) and any lessees"); *Swan Lake Moulding Company v. Department of Revenue*, 257 Or 622, 478 P2d 393 (1970) ("the tax is upon all the interests in the land, including the leasehold interest") (*Swan Lake I*), *reh'g den*, 257 Or 622, 480 P2d 713 (1971) (*Swan Lake II*). Neither *Powell Street* nor *Swan Lake I* requires assessors to value useful property as if it were vacant. *Albertsons*, 2023 WL 8889855 at *5–*7. Whether a property is actually leased is not material; it is the property's highest and best use, rather than its actual use, that guides the selection of data from which a property's value is derived. *See Swan Lake II*, 257 Or at 629.

/ / /

/ / /

---

[3] The appraiser's definition is quite different from the legal definition, according to which the fee simple is "the broadest property interest allowed by law, [which] endures until the current holder dies without heirs[.]" *Black's Law Dictionary* (11th ed 2019), *s.v.* "fee simple." Under the legal definition, an owner's fee simple interest perdures regardless of encumbrances such as leases.

Here, the fact that the subject is actually unleased does not require that unleased comparables be used to value the subject. The relevant market data will be determined from analyzing the subject's highest and best use.

B.     *Highest and Best Use*

The appraisers both state that the subject's existing use is its highest and best use. Mr. Buono understands that existing use to be general big-box retail; he does not view "home improvement" retail use as essential to the subject's highest and best use. Mr. Hockman takes a much narrower view; he understands the subject's existing use to be its specific use by Plaintiff.

Appraisal literature distinguishes between first-generation and second-generation space. (*See*, *e.g.*, Ex C at 17–18.) The former is "[a] building or space designed to be functionally and economically efficient for the original tenant or a similar class of tenants over a period of time, during which the space retains its original utility and desirability." *The Dictionary of Real Estate Appraisal* (7th ed 2022); *s.v.* "first-generation space." The latter is "[a] building or space used by a tenant other than the original tenant that is often functionally obsolete before refurbishment. Buildings or space may contain tenant improvements that can be reused by a new tenant." *Id*.; *s.v.* "second-generation space." The concepts of first- and second-generation space are particularly relevant in the valuation of big box stores, which are typically operated long-term by a single tenant, and whose architecture and location suggest that functionality and efficiency are top considerations in their siting and design. Among investors participating in the market for such properties, there may be a preference for first-generation as opposed to second-generation space. (Ex C at 17–18.)

The subject here is first-generation space. It was custom-built by Plaintiff, and Plaintiff still occupies it, indicating that it remains "functionally and economically efficient" for Plaintiff.

Furthermore, Mr. Buono has estimated that preparing the subject for use by a new tenant would involve dividing it, at costs totaling between one third and one half the subject's value. Given those facts, the subject's highest and best use is specifically as a first-generation home-improvement retail store, and not merely its use as a generic retail store.

C.      *Plaintiff's Appraisals*

Mr. Buono's sales and income approaches may be evaluated in light of the above conclusions about the property interest valued and the highest and best use.

In his sales comparison approach, Mr. Buono relied exclusively on vacant big box sales. He did so in deference to a theory that he was legally constrained to find the value of the subject without any lease in place. That theory is incorrect; in fact, Mr. Buono was free to select the sales most comparable to the subject, whether those properties were leased or not.

By excluding leased sales from his comparables, Mr. Buono excluded a segment of the market seeking to generate investment income from first-generation properties like the subject. Because properties are not transferred while remaining owner-occupied, the only remaining comparables from which Mr. Buono chose were vacant. But properties are generally vacant because they are no longer efficient for their previous occupants; such property is not first-generation space. Mr. Buono's vacant comparable sales do not share the subject's highest and best use.

The most remarkable feature of Mr. Buono's income approach is the 42-percent downward adjustment for the cost of dividing the subject into smaller leasable spaces. Mr. Buono considered that adjustment necessary because he was unable to support other adjustments for the physical characteristics of his much smaller lease comparables. However, the adjustment is thinly supported. No specific comparables supporting the adjustment were provided; it was

based on Mr. Buono's knowledge of the market and on his interviews with two brokers specializing in similar sales.

Apart from questions of proof, the adjustment for dividing the subject is inconsistent with the subject's continuing in its existing use. Although owner-occupied properties do not generate income for a landlord, they may be converted to income-generating properties without change of use via sale-leaseback.[4] The possibility of a sale-leaseback is not discussed in Mr. Buono's appraisal, and it remains unexplained why an investor purchasing a viable home-improvement big box would spend almost half its price breaking it up for use by tenants seeking smaller spaces. In effect, Mr. Buono's adjustment for dividing the subject is like a "reverse stabilization" adjustment—a property that is fully and consistently utilized at its highest and best use is adjusted to reflect its value as if it were vacant.

Mr. Buono relied on that single 42-percent adjustment in lieu of adjustments for physical differences between the subject and the lease comparables. Without it, his indicated values under the income approach are similar to—even slightly higher than—Mr. Hockman's value conclusions. However, those indicated values are entitled to little weight because they do not reflect adjustments for differences in Mr. Buono's lease comparables' physical characteristics.

C.    *Defendant's Appraisals*

Although Mr. Hockman considers his appraisals' reliability suspect because he analyzed the data under the hypothetical condition that the subject was a stabilized rental property, it is not clear to the court that that hypothetical condition would have an adverse effect. A sales approach

---

[4] A big box could conceivably remain in first-generation use through a change of tenants if, for instance, its owner-occupant were to rent it to a competitor specializing in the same retail category. The small number of national retailers participating in the first-generation big box sector makes a sale-leaseback the more likely means of converting to income-generating use.

that looks to leased properties for comparables is consistent with the highest and best use of the fully occupied subject, and it does not matter how that value is divvied up between an owner's interest and a lessee's interest. *See Swan Lake*, 257 Or at 625. The lack of actual income from the subject does not impact the income approach; any income approach would look to the market for data. Considering that the subject has a long-term occupancy at its highest and best use, seeking stabilized comparables is reasonable in applying either approach.

Because neither party seeks to raise the 2020–21 real market value, the court does not consider whether Mr. Hockman's 2020–21 appraisal—which concludes to a value significantly higher than the tax roll value—would sustain a burden of proof. On the other hand, Plaintiff has requested a lower 2021–22 value, and Mr. Hockman's 2021–22 appraisal concludes to a value ($15,440,000) three percent less than the tax roll value ($15,989,084). Although that concluded value is within the "generally accepted" 10-percent margin of error, *see Price v. Department of Revenue*, 7 OTR 18, 25 (1977), there is no countervailing evidence of a higher value. Reducing the 2021–22 tax roll value to $15,440,000 is therefore warranted.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### III. CONCLUSION

The evidence supports reducing the subject's tax roll real market value for 2021-22.

Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2021-22 real market value of the real

property identified as Account Number 171860 was $15,440,000.

Dated this _____ day of April 2024.

_____

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Poul F. Lundgren and entered on April 23, 2024.*