IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

GEORGE MOUSSA and ALMA MOUSSA,　　)
Trustees of the Moussa Family Trust,　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　　　)　　TC-MD 230094G
　　　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
DESCHUTES COUNTY ASSESSOR,　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　　　)　　**DECISION**

Plaintiffs appealed the 2022–23 real market value and maximum assessed value of their home, identified in Defendant's records as Account Number 260658. Plaintiffs appeared at trial *pro se*. Testifying for Plaintiffs were Donald Montagner, appraiser; Nicole Fitch, real estate broker; and Plaintiff George Moussa. Defendant was represented by its chief appraiser, Todd Straughan; testifying for Defendant was Dana Meyer, appraiser. Plaintiffs' Exhibits A to F and Defendant's Exhibits A to G were admitted.

## I. FACTUAL OVERVIEW

The subject is a newly built custom home in the "mid-century modern" architectural style—a single story with a flat roof and a minimalist interior that includes high ceilings and many windows. It is situated on a sloped one-acre lot at the curve of a high-traffic road in the Tetherow golf resort, just outside Bend. (Exs 1 at 4; A at 8.) It has a gross living area of 3,684 square feet, a 430-square-foot enclosed porch sometimes described as a "rec room," and a 1,936-square-foot garage. (Exs 1 at 4; A at 4, 7, 31.) It has significant covered outdoor patio areas and an upper-level deck with a mountain view. (Ex A at 12.) Plaintiffs bought the lot in May 2019 for $213,500 and completed the improvements in December 2021 at a cost "near $1,700,000." (Exs 1 at 13; 6 at 1–2; A at 4.)

The real estate market in Bend was "drastically" changing in 2021 and 2022, with inventory "at historically low levels" and strong demand after a period of uncertainty associated with the COVID-19 pandemic. (Exs 1 at 14–15; A at 4–8.) Prices increased rapidly throughout 2021; Plaintiffs' appraiser estimated a 1.52-to-1.70-percent-per-month time trend, while Defendant's appraiser estimated a 2.0-percent monthly trend after presenting evidence supporting a trend of 1.83 to 2.58 percent. (Exs 1 at 17; A at 5–6.)

On the 2022–23 tax roll, Defendant gave the subject a real market value of $2,728,740, assigning $633,000 to land and $2,095,740 to improvements. (Compl at 3.) Defendant determined an exception value of $1,821,680 by trending the 2021–22 improvements value forward one year and subtracting the result—$282,060—from the 2022–23 improvements value, then adding $8,000 for land exception value attributed to the installation of landscaping. (*Compare* Compl at 3 *with* Ex A at 41.) By applying a changed property ratio of 55.6 percent to that exception value, Defendant determined a maximum assessed value of $1,497,610.[1] (*Id*.)

The board of property tax appeals reduced the subject's 2022–23 land value to $586,026 while sustaining the improvements value, for a total real market value of $2,681,766. (Compl at 3.) The board removed the $8,000 land exception value and recalculated the maximum assessed value to be $1,493,160. (*Id*.)

On appeal here, Plaintiffs ask the court to reduce the subject's 2022–23 real market value to $2,462,000. (Ex 1 at 19.) Plaintiffs would assign $597,000 to land value and the remainder to improvements. (*Id*. at 16.) Defendant asks the court to raise the subject's real market value to $3,080,000. (Ex A at 41.) Defendant would assign $646,000 to land value and the remainder to improvements, then determine a new exception value (including $8,000 land exception value)

---

[1] By the court's calculation, the maximum assessed value should have been $1,497,604.

and maximum assessed value in the same way described above. Defendant requests a maximum assessed value of of $1,688,670. (*Id*. at 41.)

## II. ISSUES

What are the subject property's 2022–23 real market value and maximum assessed value?

## III. ANALYSIS

Because the subject is new construction, its 2022–23 real market value is used to calculate its maximum assessed value. Maximum assessed value is the upward limit on the amount of value for which a property can be taxed. Although it generally rises by no more than three percent each year, an exception applies when "new property or new improvements to property" are added to an account. ORS 308.146(1),(3)(a).[2] Under that exception, maximum assessed value is calculated by (1) determining the "exception value" (the real market value[3] of the new property less the value of any retirements), (2) multiplying that value by the "changed property ratio" (the ratio of average maximum assessed value over real market value in that county for that property class), and (3) adding the result to what the account's maximum assessed value would have been if no new property had been added to it. ORS 308.153(1),(2)(a); OAR 150-308-0170.[4]

In this case it is necessary to find the exception value of the new improvements. Plaintiffs do not challenge the method followed by Defendant, which is to find the subject's total 2022–23 real market value, then subtract the portion of that value attributable to the land and

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2021.

[3] Real market value is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205(1).

[4] Oregon Administrative Rules (OAR)

$282,060 (the trended value of the improvements on the prior year's roll). (Ex A at 41.) The result is the subject's 2022–23 exception value, from which its new maximum assessed value can then be calculated because the other variables are known: the changed property ratio is 55.6 percent, and the maximum assessed value carried forward from the prior year is $487,750. (*Id*.)

The burden of proof in this court falls on "the party seeking affirmative relief." ORS 305.427. In other words, the party who seeks a court order changing the current assessment must provide enough evidence. Here, both parties want to change the assessment. Plaintiffs must bear the burden to obtain lower tax roll values, and Defendant must bear the burden to obtain higher values.

The facts to be proved are the subject's total real market value and the amount of that value attributable to the land.[5] Each party's principal evidence is an appraisal report supported by appraiser testimony. Plaintiffs offered additional exhibits and testimony about the state of the market and about defects in the subject's construction, and Defendant offered rebuttal evidence regarding the comparables chosen in Plaintiffs' appraisal.

A.      *Valuation Evidence*

Both parties' appraisers considered the three approaches to value and determined that the sales comparison approach was the most useful. They agreed that the income approach was not relevant because homes in Tetherow "are not typically purchased for rental income." (Exs A at 4; 1 at 16.) Both appraisers prepared the cost approach, but relied on it only for their land value conclusions—they agreed that prices in the Bend market were growing so rapidly during the

---

[5] Defendant further alleges that $8,000 of the land value is exception value attributable to landscaping, but provided no evidence distinguishing landscaping exception value from land value. Defendant suggests that the board may have exceeded its jurisdiction by reducing the land exception value to zero, but develops no argument. To the contrary, ORS 309.026(2) allows boards to reduce real market value and maximum assessed value.

relevant time that Marshall & Swift's cost factors fell well short of the subject's value. (Exs 1 at 19; A at 26.)

      1.    *Plaintiffs' Value Evidence*

          a.    *Sales Comparison Approach*

Plaintiffs' appraiser, Mr. Montagner, analyzed as comparables seven sales of 2,894- to 3,828-square-foot homes in Tetherow that went under contract between February and October of 2021. (Ex 1 at 4–6.) The comparables' unadjusted sale prices ranged from $1,816,896 to $2,663,859. (*Id*.) Montagner made gross adjustments ranging from 13 to 37 percent of the unadjusted sales prices, most significantly for time, construction quality, age, gross living area, "additional features"—including the subject's rec room—and golf membership. (*Id*.) He concluded to a range of adjusted sales prices from $2,331,600 to $2,577,959. (*Id*.)

The subject's construction quality was central to the testimony of Mr. Moussa and the broker, Ms. Fitch. Numerous pictures illustrated defects such as fallen masonry and millwork, inoperative lighting strips, a bubbled roof membrane, blemished cabinetry, missing exterior caulking, uneven concrete, and water overflowing from downspouts into a finished area. (Exs 7–34.) The average of Montagner's adjustments to his comparables for construction quality was $164,871; the largest adjustments were downward by $214,600 for Comparable M6, by $268,400 for Comparable M2, and by $275,600 for Comparable M3, and upward by $249,600 for Comparable M7.[6] (Ex 1 at 4–6.)

Montagner wrote that custom homes—as opposed to homes built on speculation—were "most favored" in his analysis; three of his comparable sales were of custom homes: M4, M5, and M6. (Ex 1 at 17.) Sale M4 was unverified, and Montagner gave it "little" consideration.

---

      [6] For clarity, the court adds the appraisers' initials to their comparable sales numbers.

(*Id*. at 18.)  Montagner deemed the design of Sale M5 "most like the subject," with flat-roofed mid-century modern architecture.  (*Id*. at 5, 18.)  Its $2,467,600 adjusted sale price reflects gross adjustments totaling 35 percent of its purchase price, including an upward $338,000 adjustment for its February 2021 contract date.  (*Id*. at 5.)  Sale M5 received "moderate" consideration from Montagner.  (*Id*. at 18.)  Sale M6 also received "some" consideration after gross adjustments of 30 percent, including a downward adjustment of $214,600 for quality.  (*Id*. at 6.)  The adjusted sale price of Sale M6 was $2,430,900.  (*Id*.)

Sales M1, M2, M3, and M7 were homes built on speculation rather than fully customized homes like the subject.  (Ex 1 at 17–18.)  Montagner determined that Sale M1 "would be expected to sell for less than a custom home of similar design and size" and treated its $2,389,000 adjusted sale price as a low-end bracket for the subject.  (*Id*. at 4, 18.)  At the same time, he determined that Sales M2 and M3 were "upper bracketing properties" that should be considered "semi-custom" because their original plans were modified prior to completion.  (*Id*. at 18.)  Their adjusted sale prices (including 23- and 28-percent gross adjustments) were $2,577,959 and $2,499,547, respectively.  (*Id*. at 4.)  Sale M7 received "very little consideration due to the dated contract date"—its contract dating to March 2021.  (*Id*. at 6, 18.)

In his sales approach reconciliation, Montagner concluded to a value range of $2,331,600 to $2,577,959, with an estimated value for the subject of $2,462,000.[7]  (Ex 1 at 19.)

/ / /

---

[7] In addition to Montagner's appraisal, Plaintiffs submitted an appraisal report prepared for a lender by Scott Buckles that concluded to a value of $2,750,000 for the subject as of October 22, 2021.  (Ex 2.)  Because Mr. Buckles was not present at trial to testify and be cross-examined about his comparable selections and adjustments, the court gives that report little weight.  Plaintiffs also submitted a Comparative Market Analysis prepared by Ms. Fitch, in which she suggested a $2,200,000 list price as of August 22, 2023, based on the average sale price of four unadjusted comparables.  (Ex 3.)  Given the time difference and the lack of adjustments, that CMA has little probative value compared to the two appraisals for which testimony was received.

b.      *Land Value and Final Reconciliation*

Montagner determined the subject's land value was $597,000 based on a list of 14 land sales in Tetherow during 2021, adjusted solely for whether the sales included a golf membership. (*Id*. at 16.)  His report does not include descriptions of the parcels or otherwise relate them to the subject.

In his final reconciliation, Montagner gives "all weight" to the sales comparison approach (and "very little weight" to the cost approach).  (Ex 1 at 19.)  He concludes to a value range of $2,198,000 to $2,462,000.[8]  (*Id*.)

2.      *Defendant's Value Evidence*

a.      Sales Comparison Approach

Defendant's appraisers, Mr. Straughan and Ms. Meyer, analyzed as comparables five sales of 3,016- to 4,317-square-foot Tetherow homes with sale dates from June 2021 to June 2022.  (Ex A at 31.)  One of those, Sale S1, was unverified.  (*Id*. at 33.)  All but one of them, Sale S2, was in the subject's immediate neighborhood.  (*Id*. at 39–40.)  The comparables' unadjusted sale prices ranged from $2,500,000 to $3,150,000.  (*Id*. at 31.)  Straughan and Meyer made gross adjustments ranging from 19 to 28 percent of the unadjusted sales prices, most significantly for time, construction quality, gross living area, view, garage, and golf membership. (*Id*.)  They concluded to a range of adjusted sales prices from $2,999,400 to $3,174,200.  (*Id*.)

In choosing comparables, Straughan and Meyer sought to bracket the complexity of the subject's design.  That design was exemplified in the subject's flat roof, expansive foundation (over 6,000 square feet), abundant windows, three "en suite" bedrooms (i.e., bedrooms with

_____

[8] Montagner's final reconciliation yields a lower range than he reached in his sales comparison approach, despite placing "all weight" on that approach.

attached bathrooms), and higher-level finishes, as well as its gross living area and room count.

The most significant adjustments for Straughan and Meyer were for market conditions, which they applied at a rate of two percent per month. (Ex A at 31–32.) The data on which that trend was based included a graph showing that sale prices of higher-end properties in Tetherow (defined as having a minimum of 3,000 square feet and a minimum sales price of $1.3 million) rose steeply in mid-2021 before leveling off and fluctuating around $2.4 million throughout 2022 and into mid-2023. (*Id*. at 6.) Straughan and Meyer also made large adjustments for construction quality ($50 per square foot), which included design complexity, and for gross living area ($175 per square foot). (*Id*. at 32.)

Data from a resale occurring after the assessment date was available for Sale S2. It sold for $3,100,000 in July 2021, and again for $3,150,000 in April 2023. (Ex A at 31–33.) The time trend developled by Straughan and Meyer yielded a $420,700 upward adjustment to the July 2021 sale. (*Id*. at 31.)

Straughan and Meyer gave equal weight the adjusted sales prices of their comparables in their reconciliation, concluding to a value of $3,080,000 as of the assessment date. (Ex A at 33.)

### b. Cost Approach for Land Value

Like Montagner, Straughan and Meyer concluded that Bend's rapidly rising market conditions in 2021 made the cost approach an unreliable indicator of the subject's total value, relying on it only for the allocation of the subject's land value. (Ex A at 41.)

Straughan and Meyer selected six Tetherow land sales, described their similarities to the subject's site, and adjusted them for time of sale and golf membership. (Ex A at 25–26.) From that data they estimated a land value of $620,000. (*Id*.) They then added $18,000, the amount of exception value attributed on 2021 roll to site developments completed in 2020, and $8,000 for

the landscaping that Defendant seeks to add back to the roll as exception value for the year at issue. (*Id.* at 3–4, 25–26.) Defendant concluded to a land value of $646,000. (*Id.* at 25–26.)

B. *Court's Analysis*

The evidence includes two well-developed appraisal reports and the appraisers' testimony, each relying on an entirely different set of adjusted comparable sales. The court evaluates which comparable sales are the more reliable and to what extent the adjustments are supported.

1. Choice of Comparables

Both appraisers' sales grids showed comparables bracketing the subject's size, site characteristics, and "construction quality." Nevertheless, their conclusions diverge sharply, and that divergence is already evident in the comparables' unadjusted sales prices: Montagner's ranged from $1.82 to $2.66 million, whereas Straughan and Meyer's ranged from $2.50 to $3.15 million. Differences in date of sale are not significant enough to account for that discrepancy. Those divergent values suggest that some factor influencing the choice of comparables is not appararent on the sales grids.

Testimony suggests that factor is design complexity. According to Meyer, a more complex, customized design might include higher ceilings, more windows, a larger foundation, and better finish work. She testified that those features helped distinguish homes in Tetherow that are "nice" from those that are "very nice"—the latter category being the one in which she placed the subject.

Design complexity is evident in the photographs of the subject. (*See* Ex A at 10–24.) The subject's high-ceiling design allows for clerestory windows in the living area and the well-furnished kitchen (custom cabinetry, two sinks, two wall ovens, and a bar area with a kegerator

and a wine cooler). The subject's large foundation supports a single-story layout with an extensive covered patio, and its flat roof allows for an upper-level patio with a mountain view. The subject has three "en suite" bedrooms, meaning bedrooms with private bathrooms, which Meyer testified was a sought-after feature in the subject's market. The master bathroom contains two water closets, two walk-in closets, a freestanding tub, and a glass shower looking out on an enclosed garden. (*Id*. at 17.)

Unlike the subject, Sales M1, M2, M3, M7, and S2 were spec homes rather than custom-built. (Ex 1 at 17, 4–6.) Photographs show that many of those homes lack the subject's flat roof, high ceilings, ample windows, extensive foundation, and extra finishes. (*See* Ex G at 5–19.) Straughan and Meyer did not consider those sales to be good comparables, and even Montagner wrote that he would disfavor spec homes in his analysis. The degree to which Sales M2 and M3—Montagner's so-called "semi-custom" homes—exhibited design complexity is unclear; their floorplans show a simpler, two-story layout and less outdoor patio area. (*See id*. at 8–11.) Interior photographs were not provided.

Each of the appraisal reports contains one unverified sale—Sales M4 and S1. (Exs 1 at 18, A at 33.) Because for tax purposes "[a]ll transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions," the court does not rely on those sales. *See* OAR 150-308-0240(2)(c). Furthermore, Sale S5 sold as a "pocket listing" while under construction, meaning that its availability was shared privately with select brokers, but not with the general public. (Ex A at 33.) No adjustment was made for the different circumstances of its sale.

After eliminating unverified sales, atypical sales, and spec homes, the remaining comparables are Sales M5, M6, S3, and S4. Sale M5's flat roof and modern design makes it in

some respects a smaller version of the subject, although it lacks the subject's high windows, patio space, kitchen fixtures, and additional features. (Ex G at 14–15.) Sale M6 is also smaller than the subject, but photographs show high ceilings, ample windows, and a covered outdoor patio. (*Id*. at 16–17.) Both M5 and M6 are indicators of the subject's value. Sales S3 and S4 are situated on lots superior to the subject's, but share many of the subject's features. (Ex A at 33.) Sale S3 has a flat roof, a "flex studio" resembling the subject's rec room, outdoor patios similar to the subject, and three *en suite* bedrooms. (*Id*.) Sale S4, like the subject, has extensive windows and three *en suite* bedrooms. (*Id*.) Sales S3 and S4 are also indicators of the subject's value.

2.      Adjustments

In evaluating the value indicated by Sales M5, M6, S3, and S4, the court considers the degree of certainty attributable to the appraisers' adjustments.

By far, the largest adjustment applied by all appraisers was for market conditions; *i.e.*, time trending. Montagner adjusted by 1.70 percent per month through August 2021 and 1.52 percent per month from September through December. (Ex 1 at 17.) Straughan and Meyer adjusted by 2 percent per month throughout 2021 and into 2022. (Ex A at 6.) Both appraisers wrote that they analyzed changes in average sale prices of Tetherow homes as well as resales. However, neither appraiser provided the data on which a paired-sale analysis of market conditions was based. In addition, Straughan and Meyer's "high-end" trendline was constructed using only sales of Tetherow properties above 3,000 square feet occurring at sale prices above $1.3 million. Considering that two of their own comparables would have been excluded from that search if they were 36 square feet smaller, those parameters are overly restrictive. Furthermore, a price minimum in the search will tend to inflate the average sale prices.

Montagner's search criteria were more reasonable: sales of newer properties between 2,800 and 4,600 square feet, without a price minimum.

The appraisers also applied different adjustments for gross living area—Montagner adjusted by $124 per square foot, Straughan and Meyer by $175 per square foot. (Exs 1 at 17; A at 32.) Both appraisers relied on paired sales for their adjustments, but neither party submitted paired-sale data into evidence. Neither adjustment is adequately supported.

The appraisers differed only a little in adjusting for the rec room/flex space area. Montagner applied a flat $32,000 adjustment, whereas Straughan and Meyer applied a $30-per-square-foot adjustment for garage space (in which they included the flex space) that amounted to $30,000 to $50,000. No data was provided on which either appraisal adjustment was based.

The appraisers made significant construction-quality adjustments: Montagner adjusted by $25 or $72 per square foot, depending on the degree of quality difference, while Straughan and Meyer adjusted by a flat $50 per square foot. Plaintiffs argued that the construction defects in their home demonstrate deficiencies in workmanship, and that some lower-cost finishing materials were used, such as laminate flooring. However, despite Plaintiffs' concerns about workmanship, their appraiser classified the subject's construction quality as "very good" in his appraisal and did not make adjustments for deferred maintenance.

Because none of the adjustments is satisfactorily proven, the court evaluates the major adjustments according to the burden of proof: the adjustment least favorable to each party's requested value is applied. Sales M5, M6, S3, and S4 all occurred before the assessment date, so the smaller 1.70- and 1.52-percent market conditions trends are applied with respect to proving a greater value, and the larger 2-percent trend with respect to proving a lesser value. The court evaluates the gross living area adjustments similarly: Sales M5, M6, and S4 are smaller than the

subject, so the lesser $124 adjustment is applied with respect to Defendant's burden of proof and the greater $175 adjustment with respect to Plaintiffs. Sale S3 is slightly larger, so the opposite applies to it.

The court accepts the remaining adjustments made by the appraisers. Because the magnitude of the construction-quality adjustments are roughly similar, and because the notion of quality is closely tied to the particulars observed by a given appraiser, the court accepts each appraiser's quality adjustments for that appraiser's comparables. Golf membership adjustments are agreed. Adjustments for view and additional features—including the garage and the rec room—are unsupported, but of similar magnitude.

Relying on the four comparable sales with their adjustments modified as described above yields an indicated value of $2,686,352 under Defendant's burden of proof—an amount differing by less than 0.2 percent from the roll value of $2,681,766. Under Plaintiffs' burden, the indicated value is higher ($2,791,881); Plaintiffs have not met their burden to warrant a value reduction.

3.      Land Value, Maximum Assessed Value, and Margin of Error

Regarding value attributable to the land, the analysis of comparables performed by Straughan and Meyer is more persuasive because it includes descriptions of the comparable land sales and adjustments, showing that consideration was given to the specific features of the subject. Defendant's addition of $18,000 to that amount for site developments uncontested in a prior year is acceptable. However, no evidence of an additional $8,000 for landscaping in the year at issue has been introduced; Defendant has not borne its burden as to the landscaping. The court finds that $638,000 of the subject's total real market value is attributable to the land.

/ / /

Subtracting the $638,000 land value and $282,060 trended prior-year improvement value from $2,686,352, the subject's 2022–23 exception value is found to be $1,766,292. Multiplying that figure by the 55.6-percent changed property ratio shows a $1,045,247 increase in maximum assessed value. Adding $487,750—the amount reported by Defendant as the prior year's maximum assessed value (presumably trended forward)—yields a 2022–23 maximum assessed value of $1,469,808. Even though the total real market value is higher, the calculated maximum assessed value is about 1.56 percent lower than the $1,493,160 maximum assessed value found by the board because a higher proportion of the subject's value is located in the land.

Uncertainty is inherent in the valuation process; it has been said that it is "almost impossible" to prove a change in value of less than 10 percent of the tax roll value. *See Price v. Dept. of Rev.*, 7 OTR 18, 25 (1977). "A person experienced in property valuation, having convinced himself that a 10 percent differential or less was involved, would ordinarily seek to dissuade a client from an appeal." *Id*. In this case, the evidence shows a value less than two percent different from the value already on the roll—well within the margin of error.

## IV. CONCLUSION

Given the limited precision of the available evidence, an order decreasing or increasing the subject's tax roll values is unwarranted. Now, therefore,

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

IT IS THE DECISION OF THIS COURT that both parties' requests to change the 2022–23 tax roll real market value and maximum assessed value of Account Number 260658 be denied.

_____

POUL F. LUNDGREN
MAGISTRATE

***If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.***

***This document was signed by Magistrate Poul F. Lundgren and entered on December 23, 2024.***